DeALMEIDA, J.T.C.
This opinion follows the trial of the above-referenced matters challenging judgments of the Ocean County Board of Taxation denying tax exempt status for tax year 2007 to two residences claimed to be parsonages for plaintiffs officiating clergymen. For the reasons explained more fully below, judgments reversing the county board decisions and granting an exemption to both properties will be entered by the Tax Court Clerk.
I. Findings of Fact
These matters concern two single-family houses in Lakewood Township, Ocean County. The property designated as block 417, lot 1, is located at 74 Birch Street. The property designated as *322 block 117, lot 8, is located at 215 Fifth Street. Plaintiff, a religious organization, owns both houses and applied for an exemption from local property taxation for tax year 2007 for the properties, asserting that on October 1, 2006 the homes were the parsonages of officiating Rabbis at plaintiffs nearby synagogue. The Lakewood Township tax assessor (the “assessor”) denied the exemptions. While the assessor does not dispute that the Rabbis live in the homes, she determined that plaintiff does not operate a synagogue or serve an active congregation, as is required for a parsonage exemption. She instead decided that plaintiff operates a yeshiva, or religious school, at which religious services are periodically held. Because a parsonage exemption applies only to the homes of clergymen who officiate for active religious congregations at houses of worship, the assessor denied the exemptions. The Ocean County Board of Taxation affirmed the assessor’s decisions. Timely appeals were thereafter filed with this court.
A trial was held in this matter on May 19, 2008. The court took testimony from Jonathan Reiehenberg, an officer of plaintiff and a member of its congregation, Rabbi Yacov Josef Rotenberg, who plaintiff presented as an officiating clergyman at its synagogue, Christine Lappas, a field inspector for the Lakewood Township assessor, and Linda Solakian, the assessor. Having had the opportunity to observe the demeanor of each witness, the court finds that all testimony was provided in a candid fashion with no apparent evasion and all of the witnesses were credible. Numerous documents and photographs were admitted into evidence. Based on the testimony introduced at trial and the exhibits entered into evidence, the court makes the following findings of fact.
Plaintiff Mesivta Ohr Torah of Lakewood, Inc. (hereinafter “Mesivta Ohr Torah”) is a not-for-profit corporation organized on or about March 1, 1996 for religious, charitable and educational purposes pursuant N.J.S.A. 15A:2-8 and section 501(c)(3) of the Internal Revenue Code. According to plaintiffs bylaws, the purpose of Mesivta Ohr Torah is “to establish and conduct a house of worship for members of the Jewish faith in the Orthodox Jewish tradition, to promote Jewish awareness and for charitable pur *323 poses such as the following: the advancement of education, the advancement of religion.... ” In addition to the two properties described above, Mesivta Ohr Torah owns property at 41 Henry Street in Lakewood Township. The property at 41 Henry Street (the “Henry Street property”), on which two buildings and ancillary structures are located, has been treated as a tax exempt school pursuant to N.J.S.A. 54:4-3.6 since 1995. It was not until September 28, 2006, a few days before the operative valuation date of October 1, 2006, that plaintiff applied for an exemption on the Henry Street property as both a school and a house of worship. The Henry Street property remained exempt as a school for tax year 2007.
Mesivta Ohr Torah operates an elementary school for boys at the Henry Street property. One of the two buildings at the Henry Street property is dedicated entirely to school purposes. A portion of the bottom floor of the second building, which is two-stories in height, is also dedicated to school purposes. Plaintiff contends that in addition to serving school purposes, the second building houses a synagogue, or shul, on its second floor supported by an active congregation known as Congregation Sharei Slomo (“Sharei Slomo”). The municipality contends that both buildings are used for school purposes and that plaintiff does not maintain a house of worship on the property.
The synagogue area is approximately 1,150 square feet in size and contains an Ark, a wooden structure that houses the scrolls of the Torah. The purchase of the Ark was a considerable investment by plaintiff. Tables and chairs are arranged in front of the Ark for purposes of worship during religious services. Also in the room are separate lecterns for use by various officiants. A wall with windows encloses a separate area in which women worship during services. The synagogue is never used for school purposes, but instead for prayers, religious services, religious study, and lectures. Services are held in the facility three times a day, seven days a week, three hundred and sixty-five days a year. A separate entrance on the outside of the building leads to the synagogue, which has bathroom facilities independent from those that serve the school. Utilities are metered separately for the *324 school and synagogue. A sign at the synagogue entrance indicates that students from the school are not permitted in the synagogue. During her testimony, a field inspector employed by the municipality who had inspected the property a few days after plaintiffs application for an exemption candidly stated, “[w]hen I went out to the property there’s two buildings, and one building was a school and upstairs was a synagogue.”
Mikvas, ceremonial baths associated with religious rites, occupy four rooms on a different floor of the facility. The Mikva area includes two bathrooms and dressing rooms devoted solely to those using the ritual baths, which must be maintained according to the standards established in religious law. One of the baths is used by male members of the faith pursuant to religious custom ancillary to religious worship. Female members of the congregation use the other Mikva periodically under strictly private conditions pursuant to religious law. The congregation charges a nominal fee for use of the Mikvas, which are open both to members of the congregation and members of the public who belong to the Jewish faith.
As of October 1, 2006, Sharei Slomo consisted of approximately fifty-four members who paid annual dues. An additional forty-nine members made periodic donations to the congregation. Exhibits entered into evidence reflect “membership” income to the synagogue of $19,000 for 2005 and $21,500 for 2006. “Contributions” to the congregation amounted to $27,100 for 2005 and $32,900 for 2006. During discovery plaintiff declined to provide to defendant a list of the members of Sharei Slomo, citing privacy and First Amendment concerns. At trial, the court discussed with the parties the possibility of plaintiff submitting a list of members of the congregation to the court for in camera review. The parties did not pursue that option and the record contains only the testimony of plaintiffs two witnesses as detailed above regarding congregation membership.
Although a document purporting to represent two pages from a Lakewood Township Jewish community phone book which listed Sharei Slomo as a public synagogue was not admitted into evi *325 dence, plaintiffs two witnesses testified to personal knowledge that the congregation’s address and times of service are publicly disseminated in the Lakewood Township Jewish community and that services are open to the public at the Henry Street building. The court accepts this testimony as credible and finds that services at Sharei Slomo are publicized, open to the public and held regularly throughout the year. These facts are not critical to the court’s analysis, as nothing in N.J.S.A. 54:4-3.6 or judicial precedents requires that a congregation allow members of the general public to attend services in order to qualify for the parsonage exemption. However, the fact that Sharei Slomo is recognized in the Lakewood Township community as an established and active congregation supports plaintiffs position.
None of the members of Sharei Slomo send their children to the school operated by plaintiff. This is explained, in part, by the fact that Jewish law prevents observant members of the faith from using cars on Saturdays and religious holidays, requiring each neighborhood to have a synagogue within walking distance. The Sharei Slomo synagogue, therefore, serves local residents. The school, on the other hand, serves children from throughout Lakewood Township, with most students bussed to the facility from locations too far to walk on holy days. The school and the synagogue, including the Mikvas, maintain separate finances.
Rabbi Rotenberg, who has been an ordained rabbi for twenty-eight years, began his association with Sharei Slomo approximately in 2008. His duties include conducting services, giving sermons, attending and speaking at ceremonies, such as weddings, Bar Mitzvahs, and circumcisions, and answering any questions that members of the congregation have concerning Jewish law. In addition, Rabbi Rotenberg attends funerals and assists with prayer services during shiva mourning periods. Rabbi Rotenberg devotes approximately 25 hours per week to the synagogue. He is not compensated monetarily for his services.
Rabbi Rotenberg has also long been associated with the school operated at the Henry Street property. Documents predating October 1, 2006 identify Rabbi Rotenberg as the dean of the *326 school. He completed the initial application for a school exemption at the Henry Street property and is listed as a member of the first Board of Trustees of Mesivta Ohr Torah on its 1996 Certification of Incorporation. Rabbi Rotenberg testified that he relinquished his role as dean at the school some years prior to 2006. He also testified that he occasionally provides assistance to the school by performing minor chores at the Henry Street buildings.
Assistant Rabbi Finkel fulfills Rabbi Rotenberg’s duties when Rabbi Rotenberg is not available to do so. In addition, Rabbi Finkel is charged with supervising the children of the congregation during services. He devotes approximately 15 hours per week to the synagogue and is not compensated for his services. Neither Rabbi teaches at plaintiffs school.
Plaintiff acquired the two residential properties on September 27, 2006. Rabbi Rotenberg and Rabbi Finkel lived in the houses as tenants at the time of the purchases. Rabbi Rotenberg’s house is within five minutes walking distance of the Henry Street property. Rabbi Finkel’s home is located approximately 20 minutes away by foot. According to Rabbi Rotenberg’s testimony, sometime before the transfers, Mesivta Ohr Torah became aware of the homeowners’ intention to sell the two homes, which placed Rabbi Rotenberg’s continued service to the synagogue in jeopardy. Plaintiff, desiring to retain Rabbi Rotenberg at Sharei Slomo, endeavored to acquire title to the two homes. Mesivta Ohr Torah owns no other residential properties.
Rabbi Rotenberg characterized the transfer of the properties as “donations with conditions.” The conditions were that plaintiff satisfy existing mortgages on the two properties. The home at 74 Birch Street, where Rabbi Rotenberg lived, was owned by Jeffrey Rubin, Rabbi Rotenberg’s cousin. That house was subject to a $271,885 mortgage. The property at 215 Fifth Street, where Rabbi Finkel lived, was owned by Yosef and Libby Mitnik, Rabbi Rotenberg’s in-laws, and was subject to a mortgage in the amount of $296,104. In exchange for the properties plaintiff satisfied both mortgages. To finance the transactions, Mesivta Ohr Torah in *327 creased the amount of an existing mortgage on its Henry Street property.[1]
At the time of the transfer of the properties both Rabbis were tenants receiving rental assistance under the federal Section 8 Housing Assistance Payments Program. This arrangement continued after plaintiff purchased the homes. The Rabbis pay approximately 20% of the monthly rent to plaintiff. The federal government pays the remainder. By regulation, the total rent received on the two properties is defined as the market rate. The rental money received by Mesivta Ohr Torah is used to pay the increase in the mortgage on the Henry Street property occasioned by the purchase of the homes. In 2006, plaintiff received $11,067 in rental income on the two residences. In both 2005 and 2006, Sharei Slomo operated at a loss. Rabbi Rotenberg’s wife is a school teacher who receives compensation for her services. She *328 provides the income necessary for the Rotenberg family to meet its expenses. The record contains no evidence with respect to the income of Rabbi Finkel’s household.
In post-trial submissions, defendant challenged plaintiffs claim to parsonage exemptions on four grounds: (1) plaintiff does not operate a house of worship at its Henry Street property; (2) Rabbi Finkel is not an officiating clergyman; (3) because plaintiff receives rental income on the two homes the parsonage exemption cannot apply; and (4) granting a parsonage exemption would violate the Establishment Clause of the federal constitution because plaintiff receives Section 8 rental payments from the federal government on the two properties.
II. Conclusions of Law
The court’s analysis begins -with the well-established principle that “[t]ax exemption statutes are strictly construed, and the burden of proving entitlement to an exemption is on the party seeking it.” Abunda Life Church of Body, Mind, & Spirit v. City of Asbury Park, 18 N.J.Tax 483, 485 (App.Div.1999) (citing New Jersey Carpenters Apprentice Training and Educ. Fund v. Borough of Kenilworth, 147 N.J. 171, 177-78, 685 A.2d 1309 (1996), cert. denied, 520 U.S. 1241, 117 S.Ct. 1845, 137 L.Ed.2d 1048 (1997); Princeton Univ. Press v. Borough of Princeton, 35 N.J. 209, 214, 172 A.2d 420 (1961)). “[A]ll doubts' are resolved against those seeking the benefit of a statutory exemption.” Chester Borough v. World Challenge, Inc., 14 N.J.Tax 20, 27 (Tax 1994)(quoting Teaneck Township v. Lutheran Bible Inst., 20 N.J. 86, 90, 118 A.2d 809 (1955)). These standards, however, do “not justify distorting the language or the legislative intent” of the exemption statute. Boys’ Club of Clifton, Inc. v. Township of Jefferson, 72 N.J. 389, 398, 371 A.2d 22 (1977) (citation omitted).
The Legislature provided a parsonage exemption through enactment of N.J.S.A 54:4-3.6. That statute provides an exemption for “the buildings, not exceeding two, actually occupied as a parsonage by the officiating clergymen of any religious corporation of this State, together with the accessory buildings located on the same premises.... ” N.J.S.A. 54:4-3.6. The exemption includes the land, *329 not to exceed five acres, on which the premises are located, provided those lands are necessary for the fair enjoyment of the premises and are devoted to no purpose other than for use as a parsonage. Ibid. In addition, the statute provides that the exemption applies only if the premises, the land and any entities occupying them are not conducted for profit. Ibid. Finally, the exemption “shall apply only where the association, corporation or institution claiming the exemption owns the property in question and is ... authorized to carry out the purposes on account of which the exemption is claimed.” Ibid.
 This court has recognized that a parsonage is “defined as a ‘house owned, or held in trust, by a religious organization for religious uses in which a minister serving those uses lives.’ ” Friends of Ahi Ezer Congregation v. City of Long Branch, 16 N.J.Tax 591, 594 (Tax 1997) (quoting St. Matthew’s Lutheran Church for the Deaf v. Division of Tax Appeals, 18 N.J.Super. 552, 557, 87 A.2d 732 (App.Div.1952)); see also Assessors of Boston v. Old So. Soc’y in Boston, 314 Mass. 364, 50 N.E.2d 51, 52 (1943). It is well established that the parsonage exemption is a derivative exemption. Chester Borough, supra, 14 N.J.Tax at 27. As Judge Lasser explained
[a I parsonage is exempt only by reason of the fact that it is actually occupied as a residence by the officiating clergymen of a church. The parsonage exemption is therefore derived from the association of the parsonage with an exempt church. If there is no exempt church there can be no parsonage exemption.
[I bid. 1
Once plaintiff establishes that the property is owned by an entity that operates a house of worship, plaintiff must establish four factors to qualify for the exemption: (1) the residence must be occupied as a parsonage by the officiating clergyman of a religious corporation; (2) the entity claiming the exemption must not be conducted for profit, nor may the building or land associated with the house of worship be conducted for profit; (3) the entity claiming the exemption must own the property; and (4) the entity must be authorized to carry out the purposes of a parsonage. Friends of Aid Ezer Congregation, supra, 16 N.J.Tax at 593-94. The court will examine these factors in turn.
*330 A. Existence of a House of Worship at the Henry Street Property
The parsonage exemption applies only if an officiating clergyman “serving the needs of a reasonably localized and established congregation” resides in the subject property. St. Matthew’s Lutheran Church, supra, 18 N.J.Super. at 558, 87 A.2d 732. A “congregation signifies an assemblage or union of persons in society to worship their God publicly in such manner as they deem most acceptable to Him, at some stated place and at regular intervals.” Ibid, (citations omitted). “ ‘[A] church [or synagogue] is something more than merely a building in which the actual religious services are held; a church [or synagogue] is a building set apart for public worship, ... but the conclusion does not follow that every place in which religious services are conducted is a church [or synagogue].’ ” Friends of Ahi Ezer Congregation, supra, 16 N.J.Tax at 598 (quoting State v. Cameron, 100 N.J. 586, 595, 498 A.2d 1217 (1985)).
On the other hand, the “guaranties of the Free Exercise Clause of the federal constitution and the religious freedom clauses of our State constitution restrict inquiry into what is an organized religion, who is a member of its clergy and what constitutes a ‘congregation’ of a religious body.” Goodwill Home and Missions, Inc. v. Borough of Garwood, 281 N.J.Super. 596, 599, 658 A.2d 1330 (App.Div.1995) (citing U.S. Const, amend. I; N.J. Constit. art. I, pars. 3 and 4). Courts must therefore proceed with caution when determining whether a congregation exists for purposes of N.J.S.A. 54:4-3.6. A simple standard, requiring little intrusive inquiry controls the determination: “An institution that conducts religious services several times a week in one location and trains people in its religious tenets ... must be considered a religious congregation____” Id. at 602, 658 A.2d 1330. While a congregation must include “more than merely the pastor and his family” the statute does not require the courts to “assign any weight to the size of the congregation beyond the pastor and his family.” Roman Catholic Archdiocese v. City of East Orange, 17 N.J.Tax 298, 311 (Tax 1998) (citing Shrine of Our Lady of Fatima *331 v. Township of Mantua, 12 N.J.Tax 392 (Tax 1992)), aff'd, 18 N.J.Tax 649 (App.Div.2000).
The court concludes that plaintiff maintains a house of worship at the Henry Street property. The second floor of one of the buildings owned by plaintiff is used exclusively as a synagogue. The area contains an Ark, Torah scrolls, seating for prayers, a segregated area in which women pray and lecterns for officiating members of the clergy. Plaintiff also maintains Mikvas, ritual baths the use of which is an integral part of religious practice for members of Sharei Slomo and other members of the public who are of the Jewish faith. The synagogue area has a separate entrance from the school, is off limits to school children, and is maintained with funds derived from membership dues and contributions from members of the congregation, as well as nominal fees for the use of the Mikvas. Separate meters monitor utilities used by the school and the synagogue. While the synagogue is situated on school property and in a building that also houses educational pursuits, plaintiff maintains a separate and independent synagogue at the facility. There is no requirement in N.J.S.A. 54:4-3.6 that a house of worship occupy the entire building in which it is located. The court concludes that the separate physical facilities for the synagogue in this case are sufficient to satisfy statutory requirements for a maintaining a house of worship.
In addition, the court finds that Sharei Slomo is an active congregation. Unrefuted testimony establishes that in 2006 over fifty persons paid annual dues to the congregation and another forty-six persons made periodic contributions. Financial records demonstrate that Sharei Slomo collected over $46,000 in dues and contributions in 2005 and over $54,000 in dues and contributions in 2006. This evidence establishes a significant and active congregation of worshippers at the synagogue. Services are held at Sharei Slomo three times a day, seven days a week, three hundred and sixty-five days a year. According to Rabbi Rotenberg’s testimony, certain prayers can be said only if a quorum of ten men, or a minyon, gather together to pray communally. He testified that *332 Sharei Slomo has not had difficulty raising a minyon for its thrice daily prayer services.
The fact that plaintiff did not offer the names of individual congregants does not change the court’s conclusion. Nothing in N.J.S.A. 54:4-3.6 or relevant judicial precedents requires that a religious organization seeking a parsonage exemption name the individual members of its congregation. Rabbi Rotenberg’s credible testimony regarding the number of congregants paying annual dues and making contributions, the congregation’s financial records, the fact that Sharei Slomo has not experienced difficulty raising a minyon, the investment made by the congregation in an Ark, and photographs of the size of the area in which religious services take place all support the finding that plaintiff maintains a congregation at the Henry Street property. Defendant argues that it was frustrated in its attempts to secure a list of the congregants of Sharei Slomo so that it might investigate the validity of plaintiffs claim. It is not clear to the court how defendant would have verified the accuracy of a list of members of Sharei Slomo. Attempts to contact individual members of the congregation and question the sincerity of their allegiance to Sharei Slomo might well run afoul of the Appellate Division’s cautionary directive in Goodwill Home and Missions, supra, to refrain from too intrusive an inquiry into the operations and structures of a religious organization seeking a parsonage exemption. 281 N.J.Super. at 599, 658 A.2d 1330.
In support of its arguments regarding the lack of evidence identifying the individual members of Sharei Slomo, defendant relies on an unpublished opinion of this court rejecting a parsonage exemption in a case where the plaintiff could not specify the number of individuals in its congregation. Unpublished opinions of this court, however, lack precedential value and should not be cited by counsel except in limited circumstances not present here. See R. 1:36-3. Nor is there any indication in the record that defendant’s counsel provided the court and opposing counsel with “all other relevant unpublished opinions known to counsel including those adverse to the position of the client.” R. 1:36-3. The *333 court may disregard arguments based on an unpublished opinion. Sciarrotta v. Global Spectrum, 194 N.J. 345, 353 n. 5, 944 A.2d 630 (2008). Indeed, the Supreme Court recently “underscoreLdJ that ‘Lnjo unpublished opinion shall constitute precedent or be binding upon any court’ and that ‘no unpublished opinion shall be cited by any court.’ ” In re Alleged Improper Practice, 194 N.J. 314, 330 n. 10, 944 A.2d 611 (2008). In light of the Supreme Court’s recent pronouncements and the clear language of the R. 1:36-8 the court will not address the unpublished opinion cited by defendant.
B. Occupancy of Property as Parsonage by Officiating Clergy-mo.n
“In determining whether the parsonage exemption applies, the cases examine the extent of the clergyman’s activities within the religious organization, looking not to one particular factor but rather the entirety of the individual’s relationship to the congregation.” Temple Emanu-El v. City of Englewood, 21 N.J.Tax 462, 466 (Tax 2004) (citing Friends of Ahi.Ezer Congregation, supra). “If the duties sound like those performed by congregational leaders of all religious denominations, the clergyman is considered an officiating clergyman of the religious corporation.” City of Long Branch v. Ohel Yaacob Congregation, 20 N.J.Tax 511, 517(Tax) (quoting Friends ofAhi Ezer Congregation, supra, 16 N.J.Tax at 595) (quotations omitted), aff'd, 21 N.J.Tax 268 (App.Div.2003). “LI]t is clear that it is not status or title, but the services performed that determine if the exemption will apply.” Congregation Ahavath Torah v. City of Englewood, 21 N.J.Tax 818, 320 (Tax 2004). “A congregation has the right to determine how its minister performs his or her religious duties.” Goodwill Home and Missions, supra, 281 N.J.Super. at 604, 658 A.2d 1330. “Governmental inquiry into how a minister allocates the performance of his or her religious duties is an improper incursion into the activities of religious organization, an intrusion uncalled for by the statute and proscribed by constitutional protection.” Ibid.
“[AJn officiating clergyman when textually associated with parsonage must be a settled or incumbent pastor or minister, *334 that is, a pastor installed over a parish, church or congregation.” St. Matthew’s Lutheran Church, supra, 18 N.J.Super, at 558, 87 A.2d 732 (quotations omitted). “[MJore than one individual within a congregation may be considered officiating clergy under the statute, as evidenced by a 1962 amendment” that increased to two the number of premises that could qualify for tax exempt status. Congregation Ahavath Torah, supra, 21 N.J.Tax at 321. See also Goodwill Home and Missions, supra, 281 N.J.Super. at 598 n. 1, 658 A.2d 1330 (referring to “second parsonage ... occupied by an assistant pastor.”).
1. Rabbi Rotenberg
The court concludes that Rabbi Rotenberg was an officiating clergyman at Sharei Slomo on October 1, 2006. The Rabbi conducts prayer services, gives sermons, attends and speaks at ceremonies, such as weddings, Bar Mitzvahs, and circumcisions, and answers questions that members of the congregation have concerning Jewish law. In addition, Rabbi Rotenberg attends funerals and assists with prayer services during shiva mourning periods. He devotes approximately 25 hours per week to the synagogue. The record amply supports the conclusion that Rabbi Rotenberg is an officiating clergyman at Sharei Slomo.
2. Rabbi Finkel
The court also concludes that Rabbi Finkel was an officiating clergyman at Sharei Slomo on October 1, 2006. The unrefuted testimony at trial indicated that Rabbi Finkel, the Assistant Rabbi at Sharei Slomo, fulfills all of the rabbinical duties of Rabbi Rotenberg when Rabbi Rotenberg is unavailable to do so. This alone is sufficient to support a finding that Rabbi Finkel is an officiating clergyman. In addition, Rabbi Finkel is charged with supervising the children of the congregation during services. Rabbi Rotenberg testified that tending to the children of the congregation is an element of rabbinical duties once held by Rabbi Rotenberg but delegated to Assistant Rabbi Finkel so that Rabbi Rotenberg could focus his energy on counseling adult members of the congregation. The fact that Rabbi Finkel’s duties are aneil *335 lary to those of the chief Rabbi does not negate the parsonage exemption. “Where the activities are those performed by members of the clergy and where the individual is engaged in a continuing and regular pattern of activities, as opposed to one that is sporadic or occasional, the individual may be considered an officiating clergyman, even where the role does not include the ultimate supervision of congregational affairs or the conduct of regularly scheduled services.” Temple Emanu-El, supra, 21 N.J.Tax at 467-68. “[Tjhe question is fact-sensitive and the test is the character and extent of the activities actually performed.” Ibid. The court is satisfied that Rabbi Finkel’s duties are those of an officiating clergyman at Sharei Slomo.[2]
C. Non-Profit Status of Plaintiff
The court finds that Mesivta Ohr Torah is non-profit corporation. Plaintiff’s Certificate of Incorporation plainly provides that Mesivta Ohr Torah is organized as a non-profit entity devoted to religious, educational and other pursuits.
D. Ownership of Property by Plaintiff
There is no question that plaintiff owned the two homes at issue in this matter on October 1, 2006. The record contains undisputed evidence that Mesivta Ohr Torah purchased the two homes in September 2006 and continued to own the properties on October 1, 2006.
E. Plaintiffs Authority to Carryout Purposes of Parsonage
There is also no dispute that Mesivta Ohr Torah is authorized to operate a house of worship. Thus, plaintiff is also authorized to maintain parsonages for its officiating clergymen.
*336 F. Plaintiff’s Collection of Rent on the Properties
Defendant’s claim that plaintiffs sole motivation in purchasing the two homes was to collect rent, rather than to provide housing for its clergymen, is not supported by the record. The Supreme Court’s holding in Pingry Corporation v. Township of Hillside, 46 N.J. 457, 217 A.2d 868 (1966), is instructive on this point. In that case, the plaintiff, a non-profit education organization, operated a day school for boys. The plaintiff challenged the denial of exempt status for seven houses owned by the school, located adjacent to the campus, and rented to faculty members. Id. at 460, 217 A.2d 868. The controlling statute, N.J.S.A. 54:4-3.6, the same statute at issue here, allowed the exemption for “buildings actually used for ... schools.” The Court examined the question of whether the plaintiffs collection of rent from faculty members living in the houses excluded a finding that the premises were used for school purposes. Id. at 463, 217 A.2d 868.
The Court explained that several factors are relevant to the determination of whether a school use exemption applies in such circumstances including:
absence of a profit-making arrangement in the rental contract; desirability of providing available housing at or near the school and whether the provision of housing for its faculty is reasonably designed to further the educational purposes of the school.
Where the institution by its rental agreements with its faculty members assumes the role of an ordinary landlord and profits, the purpose to which the buildings are put can be said to only indirectly further the goals of the school and thus the finding of “actual use” cannot be found. However, where, as here, the landlord-tenant relationship is secondary to the primary purpose of providing the housing for the faculty on the campus site and no profit is possible, an exemption can be justified.
[Id. at 463, 217 A.2d 868 (citations omitted).]
After examining the record, the Court held that the Pmgiys primary “actual use” of the residences was for school purposes, satisfying the statutory requirements for an exemption. Among the factors upon which the Court relied were the fact that the houses were rented at rates “far lower” than rental rates in surrounding areas, that the rental income produced was insufficient to offset the school’s maintenance costs on the homes, and that the school operated the houses at a loss. Ibid. The Court *337 reasoned that the primary “actual use” of the homes was not to generate rental income.
The parsonage exemption contains language similar to the “actual use” standard applicable to the school exemption. To qualify for an exemption a residence must be “actually occupied as a parsonage by the officiating clergymen of any religious corporation of this State....” N.J.S.A. 54:4-3.6. Given the similarity between the two statutory standards, and the fact that they appear in the same statute, the reasoning employed by the Court in Pingrij, supra, to determine if rented homes qualified for the school exemption appropriately guides the court’s analysis in this case.
Based on the evidence produced at trial, the court finds that the primary purpose of plaintiffs acquisition of the properties was to provide housing to its officiating clergymen and that plaintiffs collection of rent on the premises does not vitiate the exemption. Two witnesses credibly testified that plaintiff obtained the homes, where Rabbi Rotenberg and Rabbi Finkel were already tenants, shortly after the landlords expressed an intention to sell the residences. According to the witnesses, plaintiffs motivation in obtaining the properties was to ensure the continued service of the Rabbis at Sharei Slomo. Lakewood Township produced no evidence to contradict this testimony. Plaintiff owns no other rental properties, a fact that supports the conclusion that plaintiffs purchase of the homes was not undertaken as part of a profit-making venture into the residential rental market. Mesivta Ohr Torah uses the rents derived from the properties to make payments on the mortgage on the Henry Street property, which was increased in order to obtain the two residences. The synagogue operated at a loss in 2005 and 2006 and the record contains no indication that the rental proceeds on the two properties were used for any purpose other than to support of the synagogue.
While it is true that the mortgage payments incrementally increase plaintiff’s equity in the Henry Street property and reduce its debt to the mortgagor, both of which inure to plaintiffs benefit, these facts alone are insufficient to put plaintiff in “the role of an *338 ordinary landlord” with respect to its officiating clergymen. See Pingry, supra, 46 N.J. at 463, 217 A.2d 868. The two houses, while providing some income to plaintiff, plainly were not profit centers for the congregation. See Paper Mill Playhouse v. Township of Millburn, 95 N.J. 503, 521-23, 472 A.2d 517 (1984) (requiring a “pragmatic inquiry” under N.J.S.A. 54:4-3.6 into nonprofit use of property for which exemption is sought, including whether owner of property makes overall profit, grants dividends, or pays excessive salaries); Long Branch City v. Monmouth Medical Center, 138 N.J.Super. 524, 533, 351 A.2d 756 (App.Div.1976)(holding that provision of apartments at below market rent to medical staff a secondary use to the primary purpose of providing housing to necessary personnel), aff'd o.b., 73 N.J. 179, 373 A.2d 651 (1977).
Nor is there any indication in N.J.S.A. 54:4-3.6 that a parsonage must be provided free of charge to officiating clergymen. While the exemption is intended to provide financial assistance to religious organizations that provide housing to officiating clergymen, the Legislature did not condition the exemption on the religious organization not collecting rent from parsonage properties. Plaintiff incurred significant debt to obtain the two residences at issue here and the rental payments it receives cover the monthly mortgage payments arising from that debt. It is reasonable to conclude that without an exemption it would be necessary for plaintiff to dedicate a portion of the congregation’s revenue, already insufficient to meeting the congregation’s operating expenses, to the payment of local property taxes, increasing plaintiff’s operating deficit. Permitting a parsonage exemption in these circumstances, therefore, furthers the legislative intent embodied in N.J.S.A 54:4-3.6. This is true even though plaintiff collects what has been defined by the federal government as a market rent for its two parsonages. Where, as is the casé here, the market rent realized on an exempt property does not provide the owner with a profit the parsonage exemption may apply.
Plaintiffs receipt of federal rental funds on the two homes raises concern. The court is mindful of the Appellate Division’s holding in Parker v. St. Stephen’s Urban Dev. Coup., 243 N.J.Super. 317, 579 A.2d 360 (App.Div.1990), in which the court held that *339 a nonprofit housing corporation that was funded largely by federal rental assistance programs was not entitled to protection under the Charitable Immunity Act, N.J.S.A. 2A:53A-7 to -11, because the entity was simply a “conduit for federal mortgage money and for federal rent subsidies” for low income tenants at housing projects. Id. at 325, 579 A.2d 360 (citations omitted). In that case, the court noted that “[tjogether with tenant rent payments, these two federal programs are intended to pay all of the costs of [the housing projects] so that it will ‘break even.’ ” Ibid. Justice (then Judge) Long reasoned that the property owner was not entitled to charitable immunity because it “was not created to lessen the burden on government” which ordinarily justifies the immunity “but to obtain as much funding from the government as possible and to operate the project exclusively with that funding.” Id. at 326, 579 A.2d 360.
The rationale of Parker, supra, is not applicable here. Mesivta Ohr Torah was not formed to obtain federal funding and to run its congregation exclusively with that funding. To the contrary, plaintiff is a religious organization established to operate a school, synagogue and other educational and religious endeavors. The record establishes that Sharei Slomo is funded largely by the contributions of its members. The federal rental assistance funds received by plaintiff are a small part of the congregation’s income and its rental of the two residences at issue here are incidental to plaintiff’s overall purpose. In addition, the justification for the protection of charitable immunity-to protect the assets of a charity that is performing acts that relieve a government of a burden it would otherwise have to perform-is not implicated by the parsonage exemption statute. The purpose of the exemption is to provide financial assistance to religious organizations that provide housing to officiating clergy and to facilitate the convenient location of parsonages. Temple Emanu-EL, supra, 21 N.J.Tax at 468. As explained above, that purpose is fulfilled here, even considering plaintiffs receipt of federal rental assistance payments. Indeed, the Parker court noted that even in the charitable immunity context, protection under that statute may be appropriate for “an actual charity which receives a measure of support from the *340 government” provided that the “essence of the entity itself’ is charitable. Parker, supra, 243 N.J.Super. at 327, 579 A.2d 360.
This court previously held that because of the differing purposes of the charitable immunity statute and N.J.S.A. 54:4-3.6, Parker, supra, is distinguishable in the context of a claim for an exemption by a charitable organization. Salt & Light Co., Inc. v. Township of Mount Holly, 15 N.J.Tax 274, 291-92 (Tax 1995) (holding that agency which receives substantial portion of income from public assistances payments and governmental grants for providing temporary shelter to homeless individuals entitled to charitable organization exemption under N.J.S.A. 54:4-3.6 despite holding in Parker ); see also Southern Jersey Family Med. Centers, Inc. v. City of Pleasantville, 351 N.J.Super. 262, 798 A.2d 120 (App.Div.2002) (holding that entity that provided health and dental care to impoverished persons entitled to tax exemption irrespective of fact that entity was almost entirely supported by Medicaid payments and government grants), aff'd o.b., 176 N.J. 184, 821 A.2d 1147 (2003). The court follows the rationale espoused by Judge Hamill in Salt & Light Co., supra, in granting the parsonage exemption here.
G. Defendant’s Constitutional Claim
Lakewood Township argues that this court should deny plaintiffs parsonage claims because granting tax exempt status to properties that generate federal Section 8 Housing Assistance Payment Program rental payments would constitute an endorsement of religion by the federal government in violation of the Establishment Clause. See U.S. Const, amend I. Defendant’s argument is unavailing.
As a threshold matter, if plaintiff’s receipt of Section 8 rental payments constitutes a violation of the Establishment Clause, the denial of plaintiffs exemption application would not remedy the constitutional violation. Plaintiff is already receiving the Section 8 rental payment on the two properties and presumably would continue to do so whether or not a parsonage exemption is granted by this court. There is, therefore, no need, as defendant alleges, *341 for this court to attempt to resolve the First Amendment claims raised by defendant.
In addition, a local property tax appeal is not the appropriate forum for determining the constitutionality of Section 8 rental payments. The United States government entity responsible for making those payments is not a party to this suit or subject to this court’s jurisdiction. If, after the grant of a parsonage exemption to plaintiff, defendant is inclined to challenge plaintiffs receipt of Section 8 rental assistance payments it is free to attempt to mount such a challenge in the appropriate forum and against the appropriate parties.
Finally, the substantive validity of defendant’s Establishment Clause claims is suspect. As the Supreme Court of the United States has explained, the Establishment Clause prohibits laws that have the purpose and effect of advancing or inhibiting religion. Agostini v. Felton, 521 U.S. 203, 222-23, 117 S.Ct. 1997, 2010, 138 L.Ed.2d 391, 414 (1997) (“[W]e continue to ask whether the government acted with the purpose of advancing or inhibiting religion [and] whether the aid has the ‘effect’ of advancing or inhibiting religion.”). It seems plain that the purpose of the Section 8 Housing Assistance Payment Program is to provide financial assistance to low-income renters, not to promote or inhibit religious activity. A program of rental payments available to a broad array of landowners, some of whom may be religious organizations would not readily be subject to challenge under the Establishment Clause. Mueller v. Allen, 463 U.S. 388, 397-99, 103 S.Ct. 3062, 3068-69, 77 L.Ed.2d 721, 729-31 (1983) (citing Widmar v. Vincent, 454 U.S. 263, 274, 102 S.Ct. 269, 276-77, 70 L.Ed.2d 440, 450 (1981)). Where numerous private choices, such as a renter’s selection of an apartment, rather than government decisions, determine where federal funds are spent, Establishment Clause concerns are not implicated. Like the school voucher program upheld by the Court in Zelman v. Simmons-Harris, 536 U.S. 639, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002), in which the parents of school children decided where to spend governmental funds for tuition, including at religious schools, the Section 8 rental program indirectly results in payments to religious organi *342 zations based on the housing decisions of low-income renters and likely does not offend the Constitution.
Judgments reversing the decisions of the Ocean County Board of Taxation and granting tax exempt status as parsonages to the two subject properties will be entered by the Tax Court Clerk.

 The deeds for the two transactions indicate that the consideration for each purchase was $1. NJ.S.A. 46:15-7 and NJ.S.A. 46:15-7.1 impose fees on the grantor at the time that a deed is recorded based on the consideration reported thereon. Consideration includes "the actual amount of money and the monetary value of any other thing of value constituting the entire compensation paid or to be paid for the transfer of title to the lands .. including the remaining amount of any prior mortgage to which the transfer is subject or which is to be assumed and agreed to be paid by the grantee....” N.J.S.A. 46:15-5(c). Because the consideration listed on the deeds in this case was below $ 100, the grantors paid no transfer fees. NJ.S.A. 46:15-10(a). Notably, although plaintiff is a tax exempt organization, the transfer fees apply to the grantor of property, not the grantee. It appears that the consideration stated on the two deeds is incorrect, given that plaintiff satisfied outstanding mortgages oí over $500,000 in the grantors' names when acquiring the houses. The understatement of the consideration on the deeds may have allowed the grantors to escape fees that are properly due. The court will send a copy of this opinion to the Director, Division of Taxation, for whatever steps she deems appropriate with respect to the transfer fees that may be due on plaintiff's purchase of the two homes. Moreover, any person who knowingly falsifies the consideration recited in a deed is guilty of a crime of the fourth degree. NJ.S.A. 46:15-9. The court will send a copy of this opinion to the Attorney General for whatever steps she deems appropriate with respect to the deeds filed in this case. As a final note, defendant argues that the deeds should be considered evidence that plaintiffs witnesses lack credibility. While the court finds the consideration listed on the deeds troubling and will make appropriate referrals, there is no evidence in the record that either of the witnesses who testified at trial directly participated in drafting the deeds.

 At the close of plaintilf's case defendant moved for a directed verdict on the question of whether Rabbi Finkel was an officiating clergyman at Sharei Slomo on October 1, 2006. The court reserved decision on the motion to review the transcript of the testimony presented during plaintiff’s case. The court now denies the motion, as evidence of Rabbi Finkel’s duties sufficient to support a finding that he was an officiating clergyman was introduced prior to the close of plaintiff's case.