TAX COURT OF NEW JERSEY



Joshua D. Novin
Judge

Washington & Court Streets, 1ˢᵗ Floor
P.O. Box 910
Morristown, New Jersey 07963
Tel: (609) 815-2922, Ext. 54680
Fax: (973) 656-4305

NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS

July 10, 2019

Tova L. Lutz, Esq.
Lutz Law Group, LLC
121 Ridge Avenue
Passaic, New Jersey 07055

Christopher John Stracco, Esq.
Day Pitney LLP
One Jefferson Road
Parsippany, New Jersey 07054-2891

Kenneth Porro, Esq.
Chasan Lamparello Mallon & Cappuzzo, PC
300 Lighting Way, Suite 200
Secaucus, New Jersey 07094

Re:     Aish Hatorah New York, Inc. v. Passaic City
        Docket Nos. 011591-2015, 013046-2016, 013047-2016, 008779-2017
        and 008446 2018

Dear Ms. Lutz, Mr. Stracco, and Mr. Porro:

This letter constitutes the court's opinion with respect to the motions filed by Aish Hatorah

New York, Inc. ("Aish") in the above-referenced matters.  Aish seeks entry of partial summary

judgment, contending that the property it owned in Passaic City ("Passaic") was exempt from local

property tax for the 2015, 2016, 2017 years, and a portion of the 2018 year.[1]

For the reasons stated below, the court orders the above matters transferred from the court's

small claims track/division to the standard track/division.  Following the transfer, and Aish's

---

[1]  As part of its application, Aish submits that the above-referenced matters may be transferred
by the court from the small claims track/division to the standard track/division for disposition.

payment to the Clerk of the Tax Court of any and all additional filing fees associated with said transfer, the court directs the Clerk of the Tax Court to enter Judgments granting Aish exemption from local property taxes for the 2015, 2016, 2017 years, and from January 1, 2018 to September 14, 2018.

## I. Factual Findings and Procedural History

Pursuant to R. 1:7-4, the court makes the following findings of fact and conclusions of law based on the pleadings, depositions, affidavits, undisputed statements of fact, and exhibits submitted by the parties.

Aish is a not-for-profit corporation organized under New York's Not-For-Profit Corporation Law, with headquarters at 313 West 83rd Street, New York, New York 10024.[2] On May 19, 2006, Aish filed a Certificate of Authority with the New Jersey Department of Treasury to be recognized in New Jersey as a Foreign Non-Profit Corporation.[3]

Aish's Certificate of Incorporation states that it was formed for the purpose of achieving the following goals:

> To develop and broaden the knowledge of Judaism and of its practices among persons of the Jewish faith, with particular emphasis and regard to the alienated and those of broad secular education.
>
> To teach the value of prayer and study of Torah teaching, and its value and meaning for us today, by analysis, discussion, and preparation for self-improvement. The personal concerns of each

---

[2] Aish is part of Aish HaTorah ("Aish Global"), "an international Orthodox Jewish outreach organization established in Jerusalem in 1974, with branches all over the world." Aish Global is a self-described provider of "Jewish educational programs and leadership training" with the goal of "revitaliz[ing] the Jewish people by providing opportunities for Jews of all backgrounds to discover their heritage in an atmosphere of open inquiry and mutual respect."

[3] Aish's New Jersey Certificate of Authority recites that its business purpose is "Charitable (501(c)3)."

2

individual shall receive special attention with the aim of spiritual self-growth.

To study the religious literature of Judaism as it has developed throughout the ages, and as it related to the Jew in modern times, particularly in the land of Israel.

To provide a cultural and social atmosphere of like-minded serious searchers for the truths found in the Orthodox Jewish faith, wherever such persons may be found the world-over.

In order to promote its organizational goals and purposes, on or about May 30, 2007, Aish purchased the properties commonly known as 2 Katherine Avenue, Passaic, New Jersey ("2 Katherine") and 4 Katherine Avenue, Passaic, New Jersey ("4 Katherine") (2 Katherine and 4 Katherine shall be collectively referred to herein as the "subject property"). The subject property are separately assessed and identified on Passaic's municipal tax map as Block 3309, Lot 19, Qualifier C0001, and Qualifier C0002. The subject property consist of two "adjoining condominium homes," situate on a single corner lot.

Although the subject property are identified on Passaic's municipal tax roll as two separate and distinct residential properties, from 2013 to September 2018, Aish operated the subject property as The Aish Woman's House (the "Aish House").[4] The Aish House was "a place to house and counsel adult unmarried women within a safe, supervised, structured Orthodox Jewish environment, under the instruction and guidance of a rabbi-in-residence." Stated differently, it provided a residential setting for adult unmarried Jewish women to nurture and develop their understanding of, and faith in Orthodox Judaism through instruction, lectures, prayer services, communal activities, and spiritual counseling under the supervision and guidance of the "rabbi-

---

[4] On September 14, 2018, Aish sold 2 Katherine and 4 Katherine to Rabbi Joshua Winter.

3

in-residence" and "foster[ed] fellowship among the participants and facilitate[d] their integration into the greater local Orthodox Jewish community in Passaic."[5]

Because the program participants "lived as secular Jews prior to enrolling in the [Aish] House, [and] are newcomers to the Orthodox community and way of life," the program was "designed to advance in [the participating] women growth in the Orthodox [Jewish] faith, education, custom, religious law, and observance[s]." The subject property provided an environment for the participants to: live together, attend evening classes and lectures, pray together, observe customs and participate in ritual events of Orthodox Judaism, and engage in communal meals. Additionally, participants "encourag[ed] each other in their faith," and "organiz[ed] events that further[ed] the mission of the [Aish] House, maintain[ed] and clean[ed] their living spaces, and communal space, contribut[ed] to the purchase and preparation of meals, and connect[ed] with local families within the local Orthodox community, with whom they . . . share[d] occasional Shabbat meals."[6]

Program participants resided at 4 Katherine, and Rabbi Winter and his family resided at 2 Katherine.[7] In general, lectures, and instruction were conducted at 4 Katherine, and religious ceremonies, spiritual/life counseling, prayer services, Shabbat services, and holiday rituals were

---

[5] Rabbi Joshua Winter ("Rabbi Winter") served as Aish House's "Campus Director" and "rabbi-in-residence" from 2013 to September 14, 2018, and his wife, Elizabeth Winter, served as "a counselor, mentor, educator, and spiritual role model as well as an events and programming coordinator." Rabbi Winter was ordained as a rabbi in the Orthodox Jewish faith in 2006. On September 14, 2018, Aish sold and conveyed the subject property to Rabbi Winter.

[6] Aish defined Shabbat as the "weekly religious ceremony with prayers, music, and blessings that is celebrated year round from sunset each Friday through sunset each Saturday."

[7] In opposition to the motions Passaic recited that program participants resided at 2 Katherine and Rabbi Winter and his family resided at 4 Katherine.

observed at 2 Katherine.[8]  However, depending on the size and nature of the event, certain lectures and events were held at 2 Katherine that were "open to the greater Passaic Orthodox community" to strengthen the program participant's "sense of fellowship and integration with their peers and elders in the Orthodox community."

Rabbi Winter's duties as "rabbi-in-residence" included "supervis[ing] the [Aish House's] environment to ensure it comports with the . . . mission" and with the principles of Orthodox Judaism.  Rabbi Winter was responsible for leading instruction, communal activities, "formal religious services, counseling with regard to spiritual and religious legal questions, life coaching/counseling, weekly Shabbat communal meals, and holiday communal meals, and observance of Jewish holiday rituals."[9]

From the exterior, 2 Katherine and 4 Katherine look like two adjoined single-family residential structures.  Similarly, the interior of 2 Katherine and 4 Katherine are organized much like any other single-family residence with a kitchen, dining area, living room, bathrooms, bedrooms, and partially finished basements.  However, 4 Katherine was assembled in such a manner to provide a "classroom" separate from the remainder of the house.[10]  All of the furniture and furnishings in 4 Katherine were supplied by Aish.

Program participants paid tuition to Aish for instruction, programming, room, and board.  According to Rabbi Winter, "[t]he tuition varie[d] from participant to participant based on various

---

[8]  During oral argument, Aish's counsel explained that under the principles of Orthodox Judaism it would have been inappropriate for the rabbi-in-residence to counsel the female program participants at 4 Katherine, thus all individual spiritual/life counseling occurred at 2 Katherine.

[9]  Rabbi Winter stated that about 20 people attended each Shabbat service, which included program participants, the rabbi's family, and members of the Passaic Orthodox Jewish community.

[10]  One of the interior photographs of 4 Katherine depicts a classroom setting with multiple chairs organized in a row with a table located at the front of the room.

5

circumstances." Tuition and room and board expenses ranged from $510 to $700 per month, and program participants stayed, "on average, about 1 year." According to Rabbi Winter, tuition was necessary to cover programming costs. However, "[n]eed based scholarships" were available to program participants from "Orthodox Jewish foundations and private donors." To enroll in the program, applicants were required to complete an application, participate in an interview process, and typically, visit the subject property to ensure that the program was "a good fit" with the applicant. The Aish House accommodated approximately seven to nine program participants at a time. From 2013 to 2018, the program served approximately fifty participants.

In June 2007, Aish applied to Passaic for local property tax exemption by filing an Initial Statement of Organization Claiming Property Tax Exemption ("Initial Statement"). On December 17, 2007, Passaic's municipal tax assessor denied Aish's application stating that "[a] charitable teaching organization does not qualify for the allowance of parsonages, according to N.J.S.A. 54:4-3.6" (the "Denial Letter").[11]

In or about March 2015, Aish filed a Petition of Appeal with the Passaic County Board of Taxation (the "Board") contesting the subject property's 2015 local property tax assessment. In filing the Petition of Appeal, counsel for Aish handwrote "EXEMPTION" on the top of the front page of each Petition of Appeal.[12] The Board entered judgments with the notation "Dismissal without Prejudice Hearing Waived." Accordingly, on June 23, 2015, Aish filed a "Complaint

---

[11] Aish submits that, on or about June 10, 2015, it filed another Initial Statement of Organization Claiming Property Tax Exemption. According to Aish, it received no response to the June 10, 2015 application from Passaic. Passaic maintains that its tax assessor's file does not contain the June 10, 2015 application. However, resolution of this issue is not material to the court's decision in these matters.

[12] Passaic did not dispute that Aish's 2015 Petition of Appeal contained the word "Exemption." Instead, Passaic submitted the certification of its municipal tax assessor stating that "the only submitted documents [in] the tax assessor's records," were the Initial Statement and Denial Letter.

6

Small Claims" and Case Information Statement with the Tax Court for the 2015 year contesting the Board's judgments. The June 23, 2015 Tax Court Case Information Statement states "Exemption claimed? _x_ Yes   No __ type."[13]

On October 8, 2015, in support of its 2015 local property tax appeal, Aish forwarded a letter to Passaic's municipal tax assessor regarding the "Exemption Appeal" and enclosed "a summary of details . . ." that it may rely on at trial. The summary detailed Aish's organization, purposes, and its use of the subject property.[14]

On or about March 28, 2016, Aish filed a Petition of Appeal with the Passaic County Board of Taxation (the "Board") contesting the subject property's 2016 local property tax assessment. In filing the Petition of Appeal, counsel for Aish handwrote "EXEMPTION" on the top of the front page of each Petition of Appeal.[15] The Board entered judgments with the notation "Dismissal without Prejudice Tax Court pending." Accordingly, on September 16, 2016, Aish's counsel filed two "Complaint[s] Small Claims" and Case Information Statements with the Tax Court for the 2016 tax year contesting the Board's judgments. The September 16, 2016 Case Information Statements state "Abatement/Exemption: No."[16]

_____

[13] On July 23, 2015, in response to a Deficiency Notice issued by the Tax Court Management Office, Aish filed an Amended Complaint and Amended Case Information Statement. The July 23, 2015 Case Information Statement states that "Exemption claimed? ___ Yes x  No ___ type."

[14] The summary also included a copy of the Initial Statement of Organization Claiming Property Tax Exemption dated June 10, 2015.

[15] Passaic did not dispute that Aish's 2016 Petition of Appeal contained the word "Exemption." Instead, Passaic submitted the certification of its municipal tax assessor stating that "the only submitted documents with the tax assessor's records," were the Initial Statement and Denial Letter.

[16] Aish subsequently filed Petitions of Appeal with the Board and complaints with the Tax Court for the 2017 and 2018 tax years. The contents of Aish's 2017 and 2018 Petitions of Appeal were not provided to the court, however Aish's 2017 and 2018 Tax Court complaints recite that tax appeals involving the subject property are pending for the 2016 and 2017 tax years.

7

By letter dated June 16, 2016, Passaic's counsel served on Aish's counsel a demand for "interrogatories to be served on Taxpayer for Exemption Case" regarding Aish's 2015 local property tax appeal. The interrogatories annexed to Passaic counsel's cover letter were titled "Standard Interrogatories For Exemption Case."

On or about March 9, 2017, Passaic's counsel forwarded a letter to Aish's counsel arguing that Aish, and the subject property's use, did not satisfy the criteria for local property exemption with respect to the 2015 and 2016 tax years.

By letter dated April 14, 2017, Aish's counsel served "Certified Answers to Standard Interrogatories, Standard Exemption Interrogatories and supporting documentation" on Passaic's counsel. Aish's counsel's letter offered further arguments in support of its 2015 and 2016 local property tax exemption claims in response to Passaic's counsel's March 9, 2017 letter.

Aish argues in support of its motions seeking partial summary judgment that the criteria for exemption from local property tax under N.J.S.A. 54:4-3.6 have been satisfied. Ash submits that it is organized exclusively as a New York not-for-profit corporation with goals of broadening knowledge of Orthodox Judaism, teaching the value of prayer and study of the Torah, studying the religious literature of Judaism, and providing a cultural and social environment for like-minded individuals devoted to exploring the truths of the Orthodox Jewish faith. Moreover, it contends that it operates, and operated the Aish House, as a non-profit program devoted to furthering those religious and moral and mental improvement goals. Thus, Aish argues that the subject property is exempt from local property tax under the following provisions of N.J.S.A. 54:4-3.6: (1) as "buildings actually used in the work of . . . corporations organized exclusively for religious purposes, including religious worship, or charitable purposes;" (2) as "buildings actually used in the work of . . . corporations organized exclusively for the moral and mental improvement of men,

8

women and children;" (3) as "the buildings, not exceeding two, actually occupied as a parsonage by the officiating clergymen of any religious corporation of this State, together with the accessory buildings located on the same premises;" and (4) as "buildings actually used for colleges, schools, academies or seminaries."[17]

In response to Aish's motions, Passaic initially filed a "Request for the Court to View the Property."[18]

In opposition to the motions, Passaic charges that issues of material fact exist and that Aish failed to demonstrate that the subject property met the standards for local property tax exemption. Specifically, Passaic maintains that Aish is not a religious corporation, but rather a "charitable teaching organization [and] does not qualify for the allowances of parsonages" under N.J.S.A. 54:4-3.6. Further, Passaic contends that 4 Katherine is not "actually used for religious purposes" or for the moral and mental improvement of the program participants, and that 2 Katherine is not "a parsonage," nor is it reasonably necessary to further the objectives of Aish. Rather, Passaic maintains that 4 Katherine is a "student dorm" and 2 Katherine is simply "Rabbi Winter's residence." Passaic also maintains that the primary use of the subject property is residential in nature and the program participants' monthly tuition payments to Aish constitute rent. Moreover, Passaic argues that 2 Katherine and 4 Katherine are not integrated components, necessary for the proper operation of one another. Finally, Passaic asserts that the subject property is not actually

---

[17] Aish did not claim in its initial moving papers that the subject property was exempt from local property tax as a school, academy or seminary under N.J.S.A. 54:4-3.6. However, it raised that argument in subsequent briefs in response to Passaic's arguments.

[18] On February 19, 2019, the court denied Passaic's request for the court to conduct an inspection of the subject property, placing a statement of reasons on the record. However, the court afforded Passaic additional time to submit opposition to the motions, to conduct an inspection of the subject property, to take photographs of the subject property, and to submit said photographs in support of its opposition.

being used for religious purposes because no "land use approval for any type of religious operations" was secured, there is no signage, nor any off-street parking and "there are at least three (3) synagogues in close proximity to the subject property and are all within walking distances. Those synagogues possess actual posted religious services and regular hours of worship." In support of its opposition to Aish's motions, Passaic submitted fifty-two photographs of the exterior and interior of the subject property.

During oral argument, Passaic raised several new arguments, asserting that deficiencies existed with respect to Aish's pleadings requiring denial of its motions. Accordingly, the court afforded Passaic an opportunity to brief those arguments and for Aish to respond to those arguments. In its supplemental brief, Passaic argues that R. 8:11(a)(2) deprives the court of jurisdiction in these matters because "[c]ases raising exemption or abatement issues are not eligible for the small claims division." R. 8:11(a)(2). Because Aish's complaints were characterized as small claims, and assigned to the small claims division, Passaic contends that no local property tax exemption claims may be pursued, and that Aish is limited to its claims regarding the subject property's valuation.[19] Additionally, Passaic maintains that Aish's failure to file a further or Initial Statement of Organization Claiming Property Tax Exemption with Passaic's tax assessor for the 2015, 2016, 2017, and 2018 tax years precludes granting a local property tax exemption.

In response, Aish submits that at all times these matters have been "litigated . . . as an exemption case" and Passaic "cannot be heard to claim it has suffered any prejudice because of any technical issues with the forms of Aish's pleadings." Moreover, as no trial has been conducted in these matters and thus, no closure of the proofs, R. 8:11(a)(e) affords the court authority, in its

---

[19] Although not addressed in its supplemental briefs, during both the first and second oral argument Passaic argued that Aish's complaints were also defective because a count for local property tax exemption was not asserted under the "four corners" of the document.

10

discretion, to retain these matters in the small claims division/track or to transfer these matters to the standard division/track. Finally, Aish maintains that the filing of a further or an Initial Statement of Organization Claiming Property Tax Exemption is not a prerequisite to the granting of a local property tax exemption under N.J.S.A. 54:4-3.6. As such, Aish maintains that it satisfied all conditions for exemption under N.J.S.A. 54:4-3.6, and thus, is entitled to an exemption from local property taxes for the 2015, 2016, and 2017 years, and a portion of the 2018 tax year.

## II. Conclusions of Law

### A. Summary judgment

Summary judgment "'serve[s] two competing jurisprudential philosophies': first, 'the desire to afford every litigant who has a bona fide cause of action or defense the opportunity to fully expose his case,' and second, to guard 'against groundless claims and frivolous defenses,' thus saving the resources of the parties and the court." Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 541-42 (1995)).

R. 4:46-2 outlines the circumstances under which summary judgment should be granted:

> if the pleadings, depositions, answers to interrogatories and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.
>
> [R. 4:46-2.]

In Brill, our Supreme Court adopted the federal approach to resolving motions for summary judgment, in which "the essence of the inquiry [is] whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." 142 N.J. at 536 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). In conducting this inquiry, the trial court must engage in a "kind of weighing

11

that involves a type of evaluation, analysis and sifting of evidential materials." Ibid. The standard established by our Supreme Court in Brill is as follows:

> [W]hen deciding a motion for summary judgment under R. 4:46-2, the determination whether there exists a genuine issue with respect to a material fact challenged requires the motion judge to consider whether the competent evidential material presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational fact finder to resolve the alleged disputed issue in favor of the non-moving party.

> [Id. at 536.]

In considering all of the material evidence before it with which to determine if there is a genuine issue of material fact, the court must view most favorably those items presented to it by the party opposing the motion and all doubts are to be resolved against the movant. Ruvolo v. American Casualty Co., 39 N.J. 490, 491 (1963). A court charged with "deciding a summary judgment motion does not draw inferences from the factual record as does the factfinder in a trial, . . . [i]nstead, the motion court draws all legitimate inferences from the facts in favor of the non-moving party." Globe Motor Co., 225 N.J. at 480 (internal citations omitted). Thus, the moving party bears the burden "to exclude any reasonable doubt as to the existence of any genuine issue of material fact" with respect to the claims being asserted. United Advertising Corp. v. Borough of Metuchen, 35 N.J. 193, 196 (1961).

"By its plain language, R. 4:46-2 dictates that a court should deny a summary judgment motion only where a party opposing the motion has come forward with evidence that creates a 'genuine issue as to any material fact challenged.'" Brill, 142 N.J. at 529. However, when the party opposing the motion merely presents "facts which are immaterial or of an insubstantial nature, a mere scintilla, fanciful, frivolous, gauzy or merely suspicious," then an otherwise meritorious application for summary judgment should not be defeated. Judson v. Peoples Bank

12

and Trust Co., 17 N.J. 67, 75 (1954). Hence, "when the evidence is so one-sided that one party must prevail as a matter of law. . . the trial court should not hesitate to grant summary judgment." Brill, 142 N.J. at 540 (quoting Liberty Lobby, Inc., 477 U.S. at 252).

The court in applying the foregoing standards to Aish's motion, and having reviewed the pleadings, deposition, undisputed statements of material fact, affidavits and exhibits submitted, the court concludes that no genuine issues of material fact are in dispute and thus, this matter is ripe for summary judgment.

### B. Notice-pleadings

New Jersey is a notice-pleading state, requiring only that a general statement of the claim need be pleaded. Printing Mart v. Sharp Electronics Corp., 116 N.J. 739, 746 (1989); see also Velop, Inc. v. Kaplan, 301 N.J. Super. 32, 56 (App. Div. 1997), appeal dismissed, 153 N.J. 45 (1998). The pleadings must include a statement of facts that will "fairly apprise the adverse party of the claims and issues to be raised at trial." Jardine Estates, Inc. v. Koppel, 24 N.J. 536, 542 (1957).

Although Passaic did not argue in either its initial or supplemental briefs the alleged failure of Aish to plead a claim for local property tax exemption, Passaic raised such arguments during oral argument.[20] R. 8:3-4(c) requires that "[a] claim for exemption shall be specifically pleaded." The rules applicable to civil proceedings also require that certain claims or defenses be specifically pled. See R. 4:5-4. Thus, in addressing Passaic's argument the court must first conduct an inquiry of "the complaint in depth and with liberality to ascertain whether the fundament of a cause of

---

[20] Passaic did not cross move for dismissal of Aish's complaints under R. 4:6-2(e) or R. 8:3-4(c), rather Passaic asserted that R. 8:3-4(c) precluded the court from granting Aish's motions for partial summary judgment.

13

action may be gleaned even from an obscure statement of claim. . . ." <u>Di Cristofaro v. Laurel Grove Memorial Park</u>, 43 N.J. Super. 244, 252 (App. Div. 1957).

When evaluating whether a complaint reasonably affords an adverse party of notice that a claim has been asserted, the court must accept as true the facts alleged in the complaint and accord plaintiff every favorable inference of fact. <u>Craig v. Suburban Cablevision</u>, 140 N.J. 623, 625-26 (1995); <u>Independent Dairy Workers Union of Hightstown v. Milk Drivers and Dairy Employees Local No. 680</u>, 23 N.J. 85 (1956). Thus, when applying this analysis, our rules require that "[a]ll pleadings shall be liberally construed in the interest of justice." <u>R.</u> 4:5-7. The test for determining the adequacy of the pleading is whether a cause of action is suggested by the facts. <u>Velantzas v. Colgate-Palmolive Corp.</u>, 109 N.J. 189 (1998).

Moreover, appeals to the Tax Court of county tax board judgments, under N.J.S.A. 54:3-21, are <u>de novo</u> and the Tax Court's authority to determine the assessment of a property "is not boundless. . . It must . . . be consistent with the issues as framed by proper pleadings or settled presumptive rules reflecting the underlying policy that governmental action is valid." <u>F.M.C. Stores Co. v. Morris Plains Borough</u>, 100 N.J. 418, 430-431 (1985) (citing <u>Pantasote Co. v. Passaic City</u>, 100 N.J. 408, 413 (1985)). <u>See also</u> N.J.S.A. 2B:13-3(b). Ultimately, under the "de novo review, the Tax Court may determine a true value different from the original assessment, the County Board's assessment, or the taxpayer's valuation." <u>Pantasote Co.</u>, 100 N.J. at 416.

With these principles in mind, the court discerns from its review of Aish's petitions of appeal, complaints, and case information statements, the undisputed material facts identified in Aish's motions, the communications between Aish and Passaic's municipal tax assessor, and the communications between Aish's counsel and Passaic's counsel, that the local property tax

14

exemption cause of action was raised, and that Passaic had actual notice that Aish's cause of actions contested the subject property's local property tax exemption.

Here, Passaic was on actual notice of Aish's 2015 local property tax exemption claim by virtue of the filed June 23, 2015 Case Information Statement which reflected that "Exemption claimed? __x__ Yes   No ___ type." Moreover, according Aish every favorable inference of fact, Aish's 2015 and 2016 petitions of appeal to the Board contained the handwritten word "EXEMPTION" along the top of each Petition of Appeal. In filing its 2015 and 2016 Tax Court complaints, Aish challenged the Judgments of the Board which affirmed the subject property's 2015 and 2016 local property tax assessments, and thus, declined to grant the subject property exemption from local property tax.

Additionally, on October 8, 2015, in support of its 2015 local property tax exemption appeal, Aish forwarded a letter to Passaic's municipal tax assessor regarding the "Exemption Appeal" and enclosed "a summary of details . . ." that it may rely on at trial. The summary detailed Aish's organization, purposes, and use of the subject property. The summary also included a copy of the Initial Statement of Organization Claiming Property Tax Exemption dated June 10, 2015.

Significantly, during the court's March 22, 2016 trial call calendar, counsel represented to the court that the tax appeals in these matters arose from whether the subject property was exempt from local property tax. Moreover, by letter dated June 16, 2016, Passaic's counsel served on Aish's counsel a demand for "interrogatories to be served on Taxpayer for Exemption Case" with respect to Aish's 2015 local property tax exemption appeal. The interrogatories annexed to Passaic counsel's cover letter were titled "Standard Interrogatories For Exemption Case." Further, by letter dated March 9, 2017, Passaic's counsel forwarded a letter to Aish's counsel arguing that Aish and the subject property did not satisfy the criteria for local property exemption with respect

15

to the 2015 and 2016 matters. Additionally, by letter dated April 14, 2017, Aish's counsel served "Certified Answers to Standard Interrogatories, Standard Exemption Interrogatories and supporting documentation" on Passaic's counsel. Aish's counsel's April 14, 2017 letter further offered arguments in response to Passaic's counsel's March 9, 2017 letter.

Considering the above facts and evidence, the court finds that Aish afforded reasonable notice to Passaic of its local property tax exemption claims and Passaic possessed actual knowledge that Aish claimed the subject property was exempt from local property tax under N.J.S.A. 54:4-3.6 during all tax years at issue. Accordingly, insofar that Passaic argues that R. 8:3-4(c) requires the denial of Aish's motions, the court respectfully declines to afford it such relief.

### C. Small claims division

Here, Aish filed complaints and case information statements in each of the above matters identifying these matters as "Smalls Claims." Accordingly, these matters were assigned to the Tax Court's small claims division/track.[21]

Pursuant to R. 8:11(a)(2), the Tax Court's small claims division is authorized to hear "all local property tax cases in which the property at issue is a class 2 (1-4 family residence) or a class 3A (farm residence) and all other local property tax cases in which the prior year's taxes for the subject property were less than $25,000." R. 8:11(a)(2); see also N.J.S.A. 2B:13-14.[22] However, under R. 8:11(a)(2), local property tax exemption matters may not be heard in the small claims

---

[21] Aish did not file a case information statement for docket no. 008779-2017.

[22] "Hearings in the Small Claims Division shall be informal, and the judge may receive evidence as the judge deems appropriate for a determination of the case, except that all testimony shall be given under oath." N.J.S.A. 2B:13-15.

division.  R. 8:11(a)(2) expressly provides that "[c]ases raising exemption or abatement issues are not eligible for the small claims division."  R. 8:11(a)(2).  Significantly though, R. 8:11 is not a mechanism intended to impact the substantive claims or defenses of litigants, rather, it is designed as a tool to limit expenses, simplify discovery rules, pretrial conferences, and trial.[23]  See Schumar v. Bernardsville, 347 N.J. Super. 325, 336 (App. Div. 2001) (concluding that "[a]lthough discovery in a small claims matter is limited by R. 8:6-1(a)(4), this rule does not limit a party's offers of proof at trial.")

Thus, our court rules afford the court with authority to transfer a matter from the Tax Court's small claims division/track to the standard division/track, "if it appears at any time before the close of proofs that a parcel of property under appeal is not within the jurisdiction of the small claims division. . . ."  R. 8:11(e).

Here, the evidence presented in these matters demonstrates that Aish contests the subject property's local property tax exemption, and the accuracy of the assessments levied on the subject property for the 2015, 2016, 2017 and 2018 years.  Thus, these matters do not meet the threshold for small claims classification under R. 8:3-4(d)(2).  Although Passaic has highlighted and the court observes the numerous clerical deficiencies contained in Aish's pleadings, the court is satisfied based on the record before it that Aish's petitions of appeal, complaints, case information statements, correspondence, and appearances before the court afforded notice to Passaic that these matters involved local property tax exemption claims.  Accordingly, to address the merits of Aish's motions for partial summary judgment, the court exercises the discretion accorded it under R.

---

[23]  A number of benefits are conferred on the small claims division litigants.  Namely, the complaint filing fee is $50.00 in the small claims division instead of the customary $250.00.  Additionally, discovery is more circumscribed and must be completed within 75 days instead of the standard 150 days.  See R. 8:6-1(a)(4); R. 8:6-1(a)(6)(i).

8:11(e), and transfers the above matters to the court's standard track. The court leaves the computation of the additional filing fees due and owing from Aish, as a result of this transfer, to the Clerk of the Tax Court.

D. The filing of an initial or further tax exemption statement

A municipal tax assessor is required to obtain, on or before November 1st of each pre-tax year, an initial statement, and on or before November 1st of every third succeeding year, a further statement, from each organization claiming a property tax exemption in the taxing district, on such forms as promulgated by the Director of the Division of Taxation. See N.J.S.A. 54:4-4.4. N.J.S.A. 54:4-4.4 provides, in part, that:

> [O]n or before November 1 of each year, said assessor shall obtain an initial statement, if one has not theretofore been filed. When an initial statement has theretofore been filed, then not later than November 1 [of the pre-tax year], . . . and thereafter not later than November 1 of every third succeeding year, said assessor shall obtain a further statement under oath from each owner of real property for which tax exemption is claimed, provided, however, that nothing herein contained shall require a further statement to be filed in the same year in which an initial statement shall have been filed, but that the further statement shall thereafter be filed at the time and in the years hereinabove required for the filing of further statements.
>
> [Id.]

However, the statutory criteria for exemption from local property tax requires only that: (i) the claimant own the property and be organized exclusively for religious, moral and mental improvement, or charitable purposes; (ii) the property must be actually used and reasonably necessary for the tax exempt purpose; and (iii) the operation and use of the property must not be conducted for profit. See Paper Mill Playhouse v. Millburn Twp., 95 N.J. 503, 506 (1984); Hunterdon Med. Ctr. v. Readington Twp., 195 N.J. 549, 561 (2008). Thus, a property's tax exempt

18

status is determined by its ownership and use and not by the owner's compliance with exemption claim procedures. Wellington v. Hillsborough Twp., 27 N.J. Tax 37 (Tax 2012).

Therefore, the failure to file an initial or further statement of tax exemption under N.J.S.A. 54:4-4.4 does not vitiate the exemption claim because the filing requirement under N.J.S.A. 54:4-4.4 is not a condition precedent to the grant of an exemption under N.J.S.A. 54:4-3.6. See Blair Academy v. Blairstown Twp., 95 N.J. Super. 583, 591 (App. Div. 1967), certif. denied, 50 N.J. 293 (1967); Atlantic County New School, Inc. v. City of Pleasantville, 2 N.J. Tax 192, 197 (Tax 1981).[24] Stated differently, a claimant's failure to comply with the triennial filing requirement has no effect upon the claimant's entitlement to an exemption. West Orange Twp. v. Joseph Kushner Hebrew Academy, 13 N.J. Tax 48 (Tax 1993). Nonetheless, if the property fails to qualify for exemption under N.J.S.A. 54:4-3.6, by virtue of its ownership and/or use as of October 1st of the pre-tax year, the property is not entitled to exempt status for the tax year in question.

The issue of whether a property qualifies for an exemption is separate and distinct from whether or not a taxpayer files an application for tax exemption (including the initial statement or further statements) under N.J.S.A. 54:4-4.4. Thus, Passaic's argument that Aish's failure to file an initial or further statement claiming tax exemption precludes entry of partial summary judgment is without merit. In sum, Aish's failure to file an application for exemption does not vitiate its exemption claims.

---

[24] In support of its position Aish submitted an unreported opinion, Oorah, Inc. v. Lakewood Twp., 2017 WL 6421062 (Tax 2017). However, "no unpublished opinion shall constitute precedent or be binding upon any court." R. 1:36-3. See Trinity Cemetery Association, Inc. v. Township of Wall, 170 N.J. 39, 48 (2001) (concluding that an unreported decision serves no precedential value and cannot reliably be considered part of our common law).

19

E.  Local property tax exemption

Unless expressly exempted by our Legislature, "[a]ll property real and personal . . . shall be subject to taxation annually. . . ."  N.J.S.A. 54:4-1.  Our State's Constitution expressly limits the Legislature's authority to grant an exemption from local property tax, providing in part, that "[e]xemption from taxation may be granted only by general laws."  N.J. Const. art. VIII, § 1, ¶ 2.  Thus, the grant of a local property tax exemption represents a significant departure from the principles of equality of treatment and the duty to share the tax burden.  Moreover, when affording statutory exemptions our Legislature "must base [them] on the property's use, not the owner's identity."  Holmdel Twp. v. New Jersey Highway Authority, 190 N.J. 74, 87 (2007).[25]

Because exemption statutes represent a deviation from the principle that all property owners must equally shoulder their fair portion of the local property tax burden, our courts have demanded that exemption statutes be strictly construed.  Princeton Univ. Press v. Princeton Borough, 35 N.J. 209, 214 (1961); Boys' Club of Clifton, Inc. v. Jefferson Twp., 72 N.J. 389, 398 (1977); New Jersey Carpenters Apprentice Training & Educ. Fund v. Borough of Kenilworth, 147 N.J. 171, 177-78 (1996).  "[A]ll doubts are resolved against those seeking the benefit of a statutory exemption."  Chester Borough v. World Challenge, Inc., 14 N.J. Tax 20, 27 (1994) (citing Teaneck v. Lutheran Bible Inst., 20 N.J. 86, 90 (1955)).  Accordingly, the burden rests with the claimant to prove entitlement to local property tax exemption.  Princeton Univ. Press, 35 N.J. at 21; New Jersey Carpenters Apprentice Training & Educ. Fund, 147 N.J. at 177-78.

---

[25]  The "tax status of property is fixed as of the assessing date."  Atlantic County New School, Inc. v. Pleasantville City, 2 N.J. Tax 192, 195-96 (1981); see also City of Jersey City v. Montville Twp., 84 N.J.L. 43, 44-45 (Sup. Ct. 1913), aff'd, 85 N.J.L. 372 (E. & A. 1913)).  Thus, questions of local property tax exemption or valuation are determined as of October 1st of the pretax year.  See N.J.S.A. 54:4-23; Catholic Relief Services, U.S.C.C. v. South Brunswick Twp., 9 N.J. Tax 25, 27 (Tax 1987), aff'd, 9 N.J. Tax 650 (App. Div. 1987).  Here, the relevant valuation or assessing dates are October 1st, of 2014, 2015, 2016, and 2017.

Although the claimant shoulders a heavy burden when seeking an exemption, the rationale or "raison d'etre for [affording taxpayers] statutory exemptions from taxation is the benefit conferred upon the public by such religious, charitable or other similar institutions and the consequent relief, . . . of the burden imposed on the state to care for and advance the interest of its citizens." Grace & Peace Fellowship Church, Inc. v. Cranford Twp., 4 N.J. Tax 391, 399 (Tax 1982) (emphasis in original). In New Jersey, the grant of a local property tax exemption is viewed as a quid pro quo, for the taxpayer's performance of a public service. See Roman Catholic Diocese of Newark v. Borough of Ho-Ho-Kus, 42 N.J. 556, 566 (1964) ("The exemption is granted by the State because of the contribution of the exempt facility to the public good."); Society of Holy Child Jesus d/b/a Oak Knoll School v. City of Summit, 418 N.J. Super. 365, 373 (App. Div. 2011) (the "legislative design of the [s]tatute has been long-recognized as a 'concession . . . [is] due as quid pro quo for the performance of a service essentially public, and which the State is hereby relieved . . . from the necessity of performing.") (citation omitted); Carteret Acad. v. State Bd. of Taxes & Assessment, 102 N.J.L. 525, 528 (Sup. Ct. 1926) ("[T]he concession is due as quid pro quo for the performance of a service essentially public, and which the state thereby is relieved . . . from the necessity of performing."), aff'd, 104 N.J.L. 165 (E & A 1927); Grace & Peace Fellowship Church, Inc., 4 N.J. Tax at 399 ("The exemption is granted in recognition of the benefit which the public derives from the fulfillment of the exempt organization's activities and objectives.").

However, in applying these principles, the court should not distort the language of the statute or the legislative intent behind it. "The rule of strict construction must never be allowed to defeat the evident legislative design." Boys' Club of Clifton, Inc., 72 N.J. at 398. The construction of a statute, while strict, must be reasonable and consistent with the underlying legislative intent. International Sch. Servs., Inc. v. West Windsor Twp., 412 N.J. Super. 511, 524 (App. Div. 2010).

21

In enacting N.J.S.A. 54:4-3.6, our Legislature afforded the following uses of property an exemption from local property tax:

> all buildings actually used for colleges, schools, academies or seminaries, provided that if any portion of such buildings are leased to profit-making organizations or otherwise used for purposes which are not themselves exempt from taxation, said portion shall be subject to taxation and the remaining portion only shall be exempt; . . . all buildings actually used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women and children, provided that if any portion of a building used for that purpose is leased to profit-making organizations or is otherwise used for purposes which are not themselves exempt from taxation, that portion shall be subject to taxation and the remaining portion only shall be exempt; all buildings actually used in the work of associations and corporations organized exclusively for religious purposes, including religious worship, or charitable purposes, provided that if any portion of a building used for that purpose is leased to a profitmaking organization or is otherwise used for purposes which are not themselves exempt from taxation, that portion shall be subject to taxation and the remaining portion shall be exempt from taxation, and provided further that if any portion of a building is used for a different exempt use by an exempt entity, that portion shall also be exempt from taxation; . . . all buildings owned or held by an association or corporation created for the purpose of holding the title to such buildings as are actually and exclusively used in the work of two or more associations or corporations organized exclusively for the moral and mental improvement of men, women and children; . . . the buildings, not exceeding two, actually occupied as a parsonage by the officiating clergymen of any religious corporation of this State, together with the accessory buildings located on the same premises.
>
> [Ibid.]

Thus, when examining whether religious, moral and mental improvement, and charitable organizations are entitled to a local property tax exemption our courts have adopted a three-prong test: "'(1) [the owner of the property] must be organized exclusively . . . for the [exempt purpose]; (2) its property must be actually . . . used for the tax-exempt purpose; and (3) its operation and use of its property must not be conducted for profit.'" Hunterdon Med. Ctr., 195 N.J. at 561 (quoting

22

<u>Paper Mill Playhouse</u>, 95 N.J. at 506)).[26]  The foregoing tests will be referred to by the court as: (1) the "organization test;" (2) the "actual use test;" and (3) the "profit test."

Aish argues that it is a corporation organized exclusively: (i) for religious purposes; and (ii) for the moral and mental improvement of men, women and children, thereby satisfying the organization test.  Moreover, it submits that it is a charitable, non-profit entity and that its operations are not conducted for profit, thereby satisfying the profit test.  Thus, Aish contends that only the issue before the court is the actual use of the subject property, which it maintains it satisfied, thereby entitling it to partial summary judgment, granting an exemption under N.J.S.A. 54:4-3.6.  Conversely, Passaic charges that based on the evidence presented Aish has failed to satisfy the organization test, the profit test and the actual use test, and thus, summary judgment is not warranted.

It is well-settled that the "finding as to exemption . . . [is] based upon an investigation of a number of factors," consequently, the court will evaluate each prong of the exemption test against the pleadings, depositions, affidavits, exhibits, and undisputed material facts to gauge whether Aish has satisfied the criteria.  <u>Pingry Corp. v. Hillside</u>, 46 N.J. 457, 463 (1966).

1.  <u>Organization test</u>

The court finds that Aish is a corporation, satisfying the organization test as: (a) a corporation organized exclusively for religious purposes; and (b) as a corporation organized exclusively for the moral and mental improvement of men, women and children.  Specifically, as evidenced by its organizational documents, Aish's mission is dedicated exclusively to developing

---

[26]  Depending on the provision under N.J.S.A. 54:4-3.6 for which exemption is sought, the organization may, or may not, be required to be exclusively organized for the exempt purpose. Here, Aish claims exemption as a religious corporation, and as a corporation organized for the moral and mental improvement of women, requiring exclusive organization; and as a school, academy or seminary, not requiring exclusive organization.

23

and broadening a knowledge of Orthodox Judaism among persons of the Jewish faith, teaching the value of prayer and study of the Torah,[27] with a particular focus on self-improvement and spiritual growth, studying Judaic religious literature and its relation to modern times, and fostering a social and cultural environment regarding truths of the Orthodox Jewish faith worldwide. The programs, platforms, and services offered by Aish, including the Aish House, are geared towards promoting those very goals and objectives.

Passaic's argument that Aish is a "charitable teaching organization," and thus cannot also be a corporation organized exclusively for religious purposes, or a corporation organized exclusively for the moral and mental improvement of men, women and children, misconstrues the statutory exemption criteria, and does not create a genuine issue of material fact.[28] N.J.S.A. 54:4-3.6 contains no requirement that a corporation organized exclusively for religious purposes be dedicated entirely to matters of religious worship, prayer and liturgy. Notably, the statute does not place any limitation or restriction on what activities comprise religious purposes, but rather broadly expresses that religious purposes include religious worship or charitable purposes. See N.J.S.A. 54:4-3.6; see also Roman Catholic Archdiocese of Newark v. East Orange City, 18 N.J. Tax 649, 655 (App. Div. 2000) (concluding that "[w]e perceive no need . . . to decide whether religious worship services which are conducted in a manner that is not reasonably calculated to attract attendance by members of the public would be sufficient to qualify the church properties for tax exemption under N.J.S.A. 54:4-3.6 even if those properties were not being used for other religious

---

[27] Torah is defined as "the body of wisdom and law contained in Jewish Scripture and other sacred literature and oral tradition." MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/Torah (last visited on July 9, 2019).

[28] Under N.J.S.A. 54:4-3.6, finding that an entity is organized exclusively for religious purposes does not preclude a finding that the entity is also organized exclusively for the moral and mental improvement of men, women and children.

purposes."); <u>Borough of Hamburg v. Trustees of Presbytery of Newton</u>, 28 N.J. Tax 311, 323 (Tax 2015) (concluding that "[a]s for worship services, there is no requirement in N.J.S.A. 54:4-3.6 that worship services must be offered in order to qualify for exemption."); <u>Mesivta Ohr Torah of Lakewood v. Lakewood Twp.</u>, 24 N.J. Tax 314, 330 (Tax 2008) (concluding that the "'guaranties [sic] of the Free Exercise Clause of the federal constitution and the religious freedom clauses of our State constitution restrict inquiry into what is an organized religion, who is a member of its clergy and what constitutes a 'congregation' of a religious body.' Courts must therefore proceed with caution when determining whether a congregation exists for purposes of N.J.S.A. 54:4-3.6.") (internal citations omitted)).

Moreover, N.J.S.A. 54:4-3.6 does not prohibit an entity organized exclusively for the moral and mental improvement of men, women and children from engaging in matters of self-improvement and spiritual growth based exclusively on religious principles, teachings, and tenets. Rather, the statute mandates only that the corporation or association be "organized exclusively for the moral and mental improvement of men, women and children." N.J.S.A. 54:4-3.6.

In <u>Girls Friendly Soc. of Pennsylvania v. Cape May City</u>, 26 N.J. Tax 549, 555 (Tax 2012), the Tax Court was faced with determining whether a "Christian retreat house," providing a one-week retreat for group members during summer months for girls ages eight to thirteen, was entitled to exemption under N.J.S.A. 54:4-3.6. The entity, who owned the property was a religious corporation devoted to providing "a program for girls within the Episcopal Church whose members accept the Christian faith and seek in the fellowship of worship, study, work and play to serve God and extend his kingdom." <u>Id.</u> at 554. Thus, the organization fostered fellowship among women and young girls under the principles and guidance of the Episcopal Church. Additionally, the retreat house afforded part-time employment opportunities for teenage group members, aged

fourteen to eighteen, to learn "about service, community, team work and responsibility." Id. at 556. However, when the retreat house was not occupied by group members, it was intermittently occupied by individuals and other groups who paid a fee for use and occupancy. In granting the property an exemption from local property tax under N.J.S.A. 54:4-3.6, the court highlighted that the taxpayer, "while clearly having a religious foundation as a result of its affiliation with the Episcopal Church, is truly a hybrid organization that also seeks to attend to the moral and mental improvement of the girls and women that it serves." Id. at 564.

Thus, an entity organized exclusively as a religious corporation and guided by religious principles, teachings, tenets, and canons, may also be organized exclusively to benefit the moral and mental improvement of men, women and children, when the purposes, goals, and efforts of such organization are founded on religious teachings and beliefs. In sum, Passaic's argument that a corporation organized exclusively for religious purposes must exclusively engage in matters of worship, prayer and liturgy, or that a corporation organized exclusively for the moral and mental improvement of men, women and children cannot be organized for religious purposes, misconstrues the express statutory language under N.J.S.A. 54:4-3.6.

Here, the court finds that Aish is such a hybrid entity, organized exclusively as a religious corporation, to wit, devoted to broadening knowledge, understanding, and observance of Orthodox Judaism. Central to Aish's organizational purpose is creating an atmosphere for like-minded individuals to delve into programs focused on self-improvement and spiritual growth through a dialogue, discussion and observance of Orthodox Judaic teachings, principles, and literature. Accordingly, the court is satisfied that Aish is: (a) a corporation organized exclusively for religious purposes; and (b) a corporation organized exclusively for the moral and mental improvement of men, women and children. The purposes of the organization, as identified in its Certificate of

26

Incorporation "clearly comports with the legislative design . . ." of the statute. Schizophrenia Foundation of New Jersey v. Montgomery Twp., 6 N.J. Tax 594, 601-02 (Tax 1984).

## 2. Profit test

Under N.J.S.A. 54:4-3.6, "[the owner's] operation and use of its property must not be conducted for profit." See Paper Mill, 95 N.J. at 506. However, an organization's "nonprofit charitable organization pursuant to I.R.C. § 501(c)(3), is not, in and of itself, enough to qualify . . . for property tax exemption under N.J.S.A. 54:4-3.6." Essex Properties Urban Renewal Associates, Inc. v. City of Newark, 20 N.J. Tax 360, 368 (Tax 2002). See Black United Fund v. East Orange, 17 N.J. Tax 446 (Tax 1998); Pompton Lakes Senior Citizens Housing Corp. v. Pompton Lakes Bor., 16 N.J. Tax 331 (Tax 1997); Third Ave., Inc. v. City of Asbury Park, 16 N.J. Tax 174, 182 (Tax 1996).

The buildings, land, and institution may not be conducted for profit. See Paper Mill, 95 N.J. at 506. However, that does not mean that an otherwise charitable, benevolent, or religious use becomes a non-qualifying for-profit use if the use "'is supported partly by fees and charges received from or on behalf of beneficiaries using or occupying the buildings . . . provided, [that] the building is wholly controlled by and the entire income therefrom is used for said charitable, benevolent, or religious purposes. . . ." Girls Friendly Soc. of Pennsylvania, 26 N.J. Tax at 571. "Even where a particular operation has produced a profit, the tax exempt status has not been lost when the excess funds have been applied to carry out the organization's beneficent policies." Boys' Club of Clifton, Inc., 72 N.J. at 403-404; see also Kimberley School v. Town of Montclair, 2 N.J. 28 (1949); Trenton v. N.J. Div. of Tax Appeals, 65 N.J. Super. 1 (App. Div. 1960).

Here, the court is satisfied based on the evidence presented, that Aish is not a profit-making entity and its funding is used to advance its non-profit goals and mission. Moreover, the Aish

House was not a program conceived to generate a profit, but rather was designed with the mission of furthering Aish's purposes including, broadening knowledge of Orthodox Judaism, teaching the value of prayer and study of the Torah, and advancing in the unmarried adult women enrolled in the program, individual self-improvement and spiritual growth through a dialogue and the observance of Orthodox Judaic customs, religious laws, and teachings. Moreover, based on the court's review of the Aish House's profit and loss statements, it operated at a substantial operating loss for the 2014, 2015, 2016, 2017, and 2018 years. Thus, it can hardly be said that the purpose and goal of the Aish House was to generate a profit. Finally, as stated above, Aish is organized in New York as a not-for-profit corporation, and in New Jersey as a foreign non-profit corporation having "charitable" business purposes.[29]

Passaic argues that Aish in its operation of the Aish House was motivated by the collection of rent, rather than by the desire to provide housing for its program participants. Moreover, Passaic contends that the program participants' tuition payments constituted rent, thereby rendering Aish House a profit-making entity. However, no evidence exists in the record supporting Passaic's claims. Additionally, Passaic has offered no evidence that the entire income received by Aish House from the program participants was not being used to further Aish's non-profit mission, goals and objectives.

In Pingry Corp., faced with the issue of whether buildings used to house faculty of a country day school, and whether the school's concomitant receipt of rental payments from the faculty to occupy those buildings precluded exemption from taxation, our Supreme Court concluded that receipt of rent does not necessarily invalidate an otherwise exemption-qualified property. 46 N.J.

---

[29] Following initial oral argument and in response to Passaic's supplemental brief, on or about May 16, 2019, Aish furnished the court with financial statements including, the Aish House's profit and loss statements, Aish's IRS Forms 8879-EO, and IRS Forms 990, among others.

at 463. The court observed that a "finding as to exemption or not has been based upon an investigation of a number of factors including the following: absence of a profit-making arrangement in the rental contract; desirability of providing available housing at or near the school and whether the provision of housing for its faculty is reasonably designed to further the educational purposes of the school." Ibid. When the "landlord-tenant relationship is secondary to the primary purpose of providing the housing for the faculty on the campus site and no profit is possible, an exemption can be justified." Ibid. The Court emphasized that the rent being charged was insufficient to offset the maintenance costs of the residences and that Pingry actually used the residences as an enticement to offer "the desired personnel low rent residences near the school" to become affiliated with the school. Thus, the residences were entitled to tax exemption. Id. at 465.

Similarly, in Blair Academy, 95 N.J. Super. at 588-589, the court addressed whether houses occupied as residences of the school faculty and administrators, as well as the school's golf course and tennis courts were exempt from taxation under N.J.S.A. 54:4-3.6. The court found that the school faculty used their residences for student consultations and other school purposes and therefore, were exempt from taxation. In addition, the court determined that the school officials were required to be available on a 24-hour a day basis, responsible for financial affairs and maintenance of the properties, and attending to all business needs, and thus their residences were exempt from taxation. Ibid. Moreover, the court found that the school's golf course and tennis courts, utilized by school teams and the student body, but which also afforded members of the public the right to play for a fee or to participate in a summer clinics, were exempt from taxation. The court keenly observed that "no profit motive or profit making" activity is engaged in by the school in making the facilities available and thus, "is a de minimis operation which does not materially affect Blair's nonprofit status." Id. at 590.

29

In Mesivta Ohr Torah of Lakewood, 24 N.J. Tax at 321, the court concluded that the taxpayer maintained a house of worship, specifically, an Orthodox Jewish synagogue and congregation. Moreover, the homes owned by the taxpayer and rented to, and occupied by its two rabbis, one whom served as congregational leader, and the other whom served as assistant rabbi, were not profit centers for the congregation. The court found that the congregation's "primary purpose . . . [of acquiring the properties] was to provide housing to its officiating clergymen and that [the congregation's] collection of rent . . . does not vitiate the exemption. . ." Id. at 337. Moreover, the court concluded that the congregation's goal and "motivation in obtaining the properties was to ensure the continued service of the Rabbis. . . . Ibid. Notably, the court emphasized that "[w]hile the exemption is intended to provide financial assistance to religious organizations that provide housing to officiating clergymen, the Legislature did not condition the exemption on the religious organization not collecting rent. . . ." Id. at 338.

Based on the court's review of Aish's organizational documents, the Aish House's profit and loss statements for the tax years at issue, the exhibits, the certifications and supplemental certifications of Rabbi Winters, and the program participants' Tuition and Programming Agreement, the court concludes that Aish's operations and its use of the Aish House was not conducted for the purpose of generating a profit. Instead, the primary focus of Aish and the Aish House was to provide an environment for the "spiritual, mental, and moral improvement" of the program participants "designed to advance . . . growth in the Orthodox faith, education, custom, religious law, and observance[s]." The tuition payments were designed to defray costs associated with operating and maintaining the Aish House, including programming and instruction costs. Moreover, Aish's landlord-tenant relationship with program participants was secondary to its primary goal of providing housing for program participants in a setting that strictly followed the

teachings, rules, rituals, and observances of the Orthodox Jewish faith. In sum, the court concludes that Aish and the use of the subject property as the Aish House was not conducted for profit and satisfies the profit test.

### 3. Actual use test

In order to be afforded an exemption from local property tax under N.J.S.A. 54:4-3.6, the property be actually used for the exempt purpose. However, N.J.S.A. 54:4-3.6 imposes no bright-line test on the quantum of the use. Roman Catholic Archdiocese of Newark v. East Orange City, 18 N.J. Tax at 655; Trustees of Presbytery of Newton, 28 N.J. Tax at 319. Rather, the test for determining whether a property is actually used for a tax exempt purpose is "whether the property is 'reasonably necessary' for such [tax exempt] purposes." City of Long Branch v. Monmouth Med. Ctr., 138 N.J. Super. 524, 532 (App. Div. 1976), aff'd o.b., 73 N.J. 179 (1977). See also Boys' Club of Clifton, Inc., 72 N.J. at 401; Hunterdon Med. Ctr., 195 N.J. at 553; Tenacre Found., 69 N.J. Super. at 565; St. Ann's Catholic Church v. Hampton Borough, 14 N.J. Tax 88, 93 (Tax 1994); Roman Catholic Archdiocese of Newark v. East Orange City, 18 N.J. Tax at 653; Girls Friendly Soc. of Pennsylvania, 26 N.J. Tax at 568.

When applying this standard, our Supreme Court has cautioned that the term "necessary" should not be interpreted as "absolutely indispensable." Boys' Club of Clifton, Inc., 72 N.J. at 401. Thus, our courts have focused on whether the property at issue was "reasonably necessary for the proper and efficient operation of" the exempt purpose; Monmouth Med. Ctr., 138 N.J. Super. at 533; and whether the property was "essential to the maintenance" of the institution, Blair Academy, 95 N.J. Super. at 589. In sum, when conducting this inquiry, the court must consider

31

how the use of the property serves the needs or furthers the purposes of the organization.

Here, the court is presented with two separately assessed, but "adjoining condominium homes," situated on a single corner lot, 2 Katherine and 4 Katherine.  4 Katherine is where program participants resided, received instruction, participated in evening classes, attended lectures, attended organized events, and shared communal space with other unmarried adult women committed to learning, developing, and broadening their understanding of the religious laws, rituals, and beliefs of the Orthodox Jewish faith.  2 Katherine is where the program's "rabbi-in-residence" resided with his family, there program participants also received instruction on various aspects of Orthodox Judaism, attended lecturers, attended events, participated in organized prayer services, engaged in communal activities, received counseling with regard to spiritual and religious matters, and attended weekly Shabbat meals, holiday meals, and other Orthodox Jewish community centered events.

Aish submits that 2 Katherine and 4 Katherine were collectively one unit, integral and necessary to the successful operation of the program.  According to Aish, a "home to house the rabbi-in residence and participants of the program is reasonably necessary for the operation of the program and furthers Aish's organizational goals.  This is, functionally, one house providing space for program participants and their teacher/mentor/religious leader to accommodate 24/7 access to one another."[30]  Thus, Aish argues that the Aish House was actually used and was reasonably necessary to further Aish's primary mission, goals and objectives.

Conversely, Passaic maintains that the two properties were "not integrated components" necessary for the operation of one another.  It argues that 2 Katherine was a "student dorm" or a

---

[30]  Alternatively, Aish argues that 2 Katherine should be considered a parsonage under N.J.S.A. 54:4-3.6.

"residence of a group of young women" and was not actually used for any religious or moral and mental improvement purposes, and that 4 Katherine constituted the residence of a rabbi.

When evaluating whether a residential property qualifies for exemption under the religious, moral and mental improvement, and charitable exemptions, the court must first determine whether the residence is "predominantly used as an integral part of the operation of the exempt organization, rather than being primarily a convenience to the tenant. . . ." Clinton Twp. v. Camp Brett-Endeavor, Inc., 1 N.J. Tax 54, 60 (Tax 1980). Only after the court is satisfied that the residence is integral to the operation of the organization, must the court turn to a determination of whether it is "reasonably necessary for the proper and efficient operation of the exempt organization." Ibid. See also City of Long Branch v. Ohel Yaacob Congregation, 20 N.J. Tax 511, 523 (Tax 2003), aff'd, 21 N.J. Tax 268 (App. Div. 2003); St. Ann's Catholic Church v. Borough of Hampton, 14 N.J. Tax 88, 99 (Tax 1994); Pompton Lakes Senior Citizens Hous. Corp. v. Pompton Lakes Borough, 16 N.J. Tax 331, 338 (Tax 1997); Girls Friendly Soc. of Pennsylvania, 26 N.J. Tax at 566.

Based on the undisputed material facts, deposition and affidavits, the court concludes that 2 Katherine and 4 Katherine are integral to the operation of the Aish House. The interrelationship between the rabbi-in-residence and the program participants, and significantly, the supervision required by the rabbi-in-residence of the residence and program participants, is central to enabling the Aish House to function in accordance with Orthodox Jewish beliefs and principles. Moreover, the location and proximity of the program participants to the rabbi-in-residence is fundamental to the efficient operation of the Aish House program.

The Aish House was conceived to provide an atmosphere for unmarried adult Jewish women to nurture and develop their faith in Orthodox Judaism, in a supervised and structured

33

environment with other like-minded individuals. The program operated under the guidance and instruction of an ordained Orthodox Jewish "rabbi-in-residence," who was charged with the responsibility to ensure that the Aish House was maintained, that the program participants observed, and that the program complied with all applicable laws of Orthodox Judaism. According to Aish, the presence of an Orthodox Jewish "rabbi-in-residence" in close proximity to the program participants was fundamental to the program's efficacious operation, not only to regularly ensuring that the program participants were receiving instruction, living, and observing Orthodox Jewish customs, but due to the religious beliefs of the Orthodox Jewish faith, which prohibits travel by vehicle during the weekly observance of Shabbat and on other religious holidays. Moreover, the instruction and interaction with the rabbi-in-residence was fundamental to instilling in the program participants the ideals and principles of Orthodox Judaism including its laws, beliefs, customs, and rituals, which was Aish's goal and mission.

Additionally, because the program participants had chosen to leave behind secular lives, a central theme of the program was offering program participants mentoring, counseling, and spiritual and personal guidance to facilitate their integration into the local Orthodox Jewish community. As expressed by Aish, the Aish House program was designed "as a spiritual, mental and moral improvement program . . . provid[ing] an experience that enables the [program participants] to grow in Orthodox faith, education, custom, religious law and observance."

Thus, for the above-stated reasons, the court finds that 2 Katherine and 4 Katherine were both integral and reasonably necessary for Aish's proper and efficient operation of the Aish House, joined in an assembly, relationship and/or collaboration of religious and spiritual enlightenment, activities, supervision, and instruction for program participants. Therefore, the court find that Aish and the Aish House satisfy the actual use test.

4. Land use

Passaic asserts that the subject property is not actually being used for religious purposes because no "land use approval for any type of religious operations" was secured, there is no signage, nor any off-street parking and "there are at least three (3) synagogues in close proximity to the subject property and are all within walking distances. Those synagogues possess actual posted religious services and regular hours of worship."

Aish does not dispute that it did not seek land use approval for any type of religious operations for the tax years under appeal. Moreover, Aish does not contend that there is signage affixed to the subject property, no off-street parking, nor exterior items of religious representation on the land for the subject property.[31] However, Aish argues that its failure to obtain land use approval, affix signage, and secure off-street parking are not conditions precedent to the grant of local property tax exemption under N.J.S.A. 54:4-3.6.

As stated above, residential property is actually used for a tax-exempt purpose when it is "predominantly used as an integral part of the operation of the exempt organization, rather than being primarily a convenience to the tenant . . ." and is "reasonably necessary for the proper and efficient operation of the exempt organization." Camp Brett-Endeavor, Inc., 1 N.J. Tax at 60. In evaluating whether a building is reasonably necessary for the tax-exempt purpose, the court should evaluate use of the building in terms of how it serves the particular organization. Boys' Club of Clifton, Inc., 72 N.J. at 401-02. However, N.J.S.A. 54:4-3.6 "clearly and unambiguously" imposes no requirement that "the property be [put to] a lawful use under the municipality's zoning

---

[31] Aish disputes Passaic's assertion that there is no posting of religious services, contending that services are posted on its website and on flyers distributed throughout the Passaic Orthodox Jewish community. However, resolution of this issue is not material to the court's decision in these matters, as the posting of religious services is not a condition, nor a requirement for exemption under N.J.S.A. 54:4-3.6.

ordinance in order to qualify for tax exemption." Society of the Holy Child Jesus v. City of Summit, 418 N.J. Super. 365, 386 (App. Div. 2011).

In Society of the Holy Child Jesus, our Appellate Division observed that N.J.S.A. 54:4-3.6 does not have an underlying land use objective, rather it operates to "compensate the taxpayer for 'the contribution of the exempt facility to the public good.'" 418 N.J. Super. at 380 (quoting Borough of Ho-Ho-Kus, 42 N.J. at 566). The benefit conferred by the exempt organization's performance of a public service does not change merely because of the location of the facility. Id. at 382-83. Thus, if a taxpayer satisfies the requirements under N.J.S.A. 54:4-3.6, "it is entitled to the exemption from real property taxes even if the use of the property does not comply with [a] municipal zoning ordinance." Id. at 368.

Here, as expressed above, the court finds that Aish has satisfied the statutory criteria for exemption from local property tax and thus, issues of zoning, signage, and off-street parking are inapposite to the court's determination whether the subject property is exempt from taxation.

Finally, to the extent that Passaic in its supplemental brief renewed its request for the court to conduct an inspection of the subject property, the court denies such request for the same reasons expressed in the court's February 19, 2019 bench opinion in these matters.

**III. Conclusion**

Accordingly, after having considered the briefs, exhibits, undisputed material facts, pleadings, deposition, and affidavits, the court finds that Aish is a corporation organized exclusively: (a) for religious purposes; and (b) for the moral and mental improvement of men, women and children, thereby satisfying the organization test. Aish is a charitable, non-profit entity and its operations, including the Aish House, are not conducted for profit, thereby satisfying the profit test. And finally, 2 Katherine and 4 Katherine were integral and necessary for Aish's

36

operation of the Aish House, and therefore reasonably necessary for Aish's religious purposes and moral and mental improvement purposes. Therefore, the court finds that Aish has satisfied the requirements for exemption under N.J.S.A. 54:4-3.6.[32]

As such, the court orders the above matters transferred from the court's small claims track/division to the standard track/division. Following the transfer, and Aish's payment to the Clerk of the Tax Court of any and all additional filing fees associated with said transfer, the court directs the Clerk of the Tax Court to enter Judgments granting Aish exemption from local property taxes for the 2015, 2016, 2017 years, and from January 1, 2018 to September 14, 2018.[33]

Very truly yours,


Hon. Joshua D. Novin, J.T.C.

---

[32] Having concluded that Aish satisfied the criteria for exemption under N.J.S.A. 54:4-3.6 as: (1) "buildings actually used in the work of associations and corporations organized exclusively for religious purposes, including religious worship, or charitable purposes;" and (2) "buildings actually used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women and children," the court need not address the balance of the arguments raised by Aish in its motions.

[33] The court reaches no conclusion with respect to the subject property's ownership, organization, profit, or actual use after September 14, 2018.